Martha PARKER, Appellant,

v.

Michael CARNAHAN, The Law Firm of
Smith, Schulman, Rawitscher & Carna-
han, Robert E. Hopper, The Law Firm
of Stanley C. Frank & Associates, and
William Jackson, Appellees.

No. 9681.

Court of Appeals of Texas,
Texarkana.

April 11, 1989.

Rehearing Denied May 16, 1989.

Robert D. Topping, Chamberlain, Hrdlicka, White, Johnson, Houston, for Martha Parker.

Jack E. Urquhart, Holtzman & Urquhart, Houston, for Michael Carnahan.

William E. Matthews, Sewell & Riggs, Houston, for Robert E. Hopper.

Wilton F. Chalker, Lorance & Thompson, Houston, for William Jackson.

GRANT, Justice.

Martha Parker appeals from an adverse summary judgment granted to Robert Hopper and the law firm of Stanley C. Frank & Associates (hereafter referred to collectively as the Hopper law firm), Michael Carnahan and the law firm of Smith, Schulman, Rawitscher & Carnahan (hereafter referred to collectively as the Carnahan law firm), and accountant William Jackson. Martha Parker contends in her sole point of error that summary judgment was improperly granted to the appellees.

Martha Parker was married to Dr. John Parker, a dentist, for the second time between 1976 and 1985. Her husband had failed to file federal income tax returns between 1978 and 1983 inclusive. She had signed blank returns, had given him her withholding information, and had believed that he was filing the returns. Dr. Parker was indicted for failure to file. He went to his attorney, Robert Hopper, and explained the situation. Hopper told him that he did not handle this type of case and referred him to Carnahan, a criminal defense specialist. As part of his defensive strategy, Michael Carnahan hired William Jackson to prepare tax returns for the missing years. Jackson prepared joint returns, as had been filed by the Parkers in the previous years.

Dr. Parker brought his wife to Carnahan's office and Carnahan informed her of the charges pending against Dr. Parker. He also told her that because she was an innocent spouse there would probably be no criminal charges filed against her. She was told that the returns needed to be signed and filed. She did a rough recomputation of the total amounts shown owing by the returns and signed all the returns, which were then promptly filed.

■ When a tax return is filed "married filing jointly" (as in this case), the spouses are jointly and severally liable for all taxes and for any assessed penalties and interest. If the return had been prepared as "married filing separately," Martha Parker would have been liable for half of the tax owed by the community, i.e. based upon the community property income of both spouses, but she would not have been jointly and severally liable for penalties and interest incurred by her husband's nonpayment. As her salary had been withheld properly, her personal total liability would have been much lower as a married person filing separately. *See* 33 Am.Jur.2d *Federal Taxation* §§ 1390–1399 (1989).

The Parkers divorced for a second time in January of 1982. The divorce decree provided that Dr. Parker would pay all of the couple's income tax liabilities. Dr. Parker went into bankruptcy and did not pay the taxes, penalties and interest owing. Martha Parker's separate-property home was sold by the IRS in a forced sale. The amount from the sale would have extinguished the tax liability she would have incurred had she filed separately, but because of the joint return, she remained liable for over $100,000 after the sale.

Martha Parker filed this suit contending that the attorneys were negligent in failing to advise her of her potential liability under a joint return and its possible reduction by filing separately, because she was effectively their client; that alternatively, if she were not their client, they were negligent in failing to advise her to seek legal counsel. She further alleged that the attorneys had exerted undue influence on her or had behaved in a fraudulent fashion to obtain her signature on the returns. She also alleged the defendants had violated the Deceptive Trade Practices Act, Tex.Bus. & Com.Code Ann. §§ 17.41, et seq. (Vernon 1987), by their representations and omissions.

A summary judgment will be denied unless the movants clearly establish their right to it as a matter of law. The movants have the burden to show that there is no issue of material fact and that they are entitled to judgment as a matter of law. In deciding whether there is a disputed

material fact issue, we take as true evidence favorable to the nonmovant. Every reasonable inference is indulged in favor of the nonmovant and all doubts are resolved in the nonmovant's favor. *Wilcox v. St. Mary's University of San Antonio,* 531 S.W.2d 589 (Tex.1975); Tex.R.Civ.P. 166a.

The appellees contend that the depositions of appellant's experts, Steele and Blask, along with the attachment to Parker's motion for a new trial, were untimely filed and thus cannot be considered by this Court in its review of the judgment. Texas Rule of Civil Procedure 166a(c) requires that such document be filed more than seven days prior to the day of hearing. The Steele and Blask depositions were filed after the hearing on the motion for summary judgment and after their attorney had been advised by the court that summary judgment had been granted. The depositions were undisputedly filed late under the rule. Late filing of a response is discretionary with the trial court. *INA of Texas v. Bryant,* 686 S.W.2d 614, 615 (Tex.1985). Before a late-filed response will be considered, the record must affirmatively indicate the trial court's acceptance of the late-filing. *Goswami v. Metropolitan Savings and Loan,* 751 S.W.2d 487 (Tex.1988). The record does not indicate that the trial court gave its permission to late-file these documents. Thus, they were not before the trial court and will not be considered by this Court in conducting its review.

The Hopper law firm filed the first motion for summary judgment. In support of its motion for summary judgment, the Hopper law firm attached excerpts from the deposition of Martha Parker, William Jackson, Michael Carnahan, Robert E. Hopper and Stanley C. Frank, Jr. William Matthews, the Hopper law firm's attorney, swears the excerpts are true and correct copies of portions of the depositions. A copy of the Parkers' 1986 divorce decree is also attached and sworn to be true and correct by the attorney. The Carnahan law firm and Jackson also filed summary judgment motions. They did not duplicate all of the excerpts from the depositions that had been filed by the Hopper firm. We have found no case requiring such duplication of summary judgment evidence which is already before the court. We therefore considered all of the summary judgment evidence which was appropriately before the trial judge at the time the summary judgment was granted.

We shall first look at the summary judgment proof to determine if there is a fact issue as to whether the attorneys and their respective law firms represented Martha Parker as a client. For the most part, the facts are not disputed. The following is all of the testimony from Martha Parker's deposition about the occurrences upon which she relies to create liability on the part of the appellees:

Q When was the first time that you realized that Dr. Parker had gotten into serious criminal trouble with the IRS in the failure to file returns?

A In June of 1984.

Q What was it that brought this to your attention?

A He asked me to go with him and meet with his attorneys. And I asked him what it was about. He said just some tax problems. And his attorneys told me at the meeting about his problems.

. . . .

Q Where was this meeting?

A It was in Mr. Hopper's office.

Q Had you ever been in that office before?

A No.

Q Had you ever met Mr. Hopper or anyone else that you met that day?

A No.

Q Who was at the meeting?

A Mr. Carnahan, Mr. Hopper, my husband, and me.

Q What was Dr. Parker's explanation to you?

A He never gave me an explanation. His attorneys' explanation to me was that he was so concerned about the problems we were having with our son, that he just sort of overlooked filing them.

. . . .

Q How long did this meeting last?

A I don't remember. Probably less than two hours.

. . . .

Q Did he say how long he had been seeing his attorneys or how long they had been representing him in this criminal matter?

A No. His attorneys mentioned at the meeting when the indictment was handed down, but I don't remember.

. . . .

Q Do you have a good memory of this meeting and what was said? Because I would like to ask you to recount to me all that you can recall at this time.

A Well, I'm sure I can't remember everything that was said. But when I first went in, they asked me if I knew why I was there. I said not really.

So, they told me about the indictment, told me that there was a very good chance that my husband would be sent to jail for this if we could not prevail on the sympathies of the Court, and that they were hoping to show that because of his mental state, he just neglected to file these.

That he was not trying to evade the taxes or get out of paying them or wasn't protesting the taxes, just that he had not filed the returns and that he would be of much more use to the community if he were out of jail and working than if he were in the penitentiary.

They told me that they were trying to work out a method of payment with the IRS, and I asked them how much money was involved. They said they didn't have an exact amount at that time. They knew the amount of the taxes, but they did not know the amount of the penalties and interest.

They said that the lawsuit that had been filed covered only three of those years and that they hoped, by getting the returns filed, they could avoid another lawsuit covering the remainder of the years.

Q So they wouldn't re-indict him for the other three years?

A Yes. That's the essence of the meeting.

Q How did the meeting break up, on what note? What was left? What was the game plan?

A Well, the game plan was to get the tax returns filed and hope that when the matter came to a hearing, that the Judge would be sympathetic.

. . . .

Q Is there anything further that you recall out of that meeting?

A We had some further discussion. I asked them why I had not been included in the indictment since I thought I had been filing joint returns and I had been filing none. They said that I was considered an innocent spouse. And they talked about working out a plan of paying this debt off with the IRS.

They talked about different things that could be done, such as selling our property to pay off the IRS and making monthly payments and—

Q Various options that might be thought of and worked out if the IRS agreed?

A Yes. And they had said it might be $150,000. I said I didn't see how we could ever pay that off.

They talked about things in our family, who helped the children with their homework and that kind of thing, because I was out of town a great deal of time. And most of it was just general conversation about who paid the bills and who took care of the kids and—

Q Trying to come up with things that they could tell the Judge about Dr. Parker which would encourage him to give him some type of probation and not incarcerate him in prison?

A I assume so, yes.

Q They told you that was what they were trying to do?

A Yes.

Q To represent Dr. Parker and keep him from going to prison, if they could, by getting some sort of probation?

A Yes. They told me that they were trying to keep him out of prison definitely.

Q Thereafter, did you meet with these attorneys again?

A I met with Mr. Carnahan. He had called me and asked me to be at the sentencing.

Q Was that the next contact that you had with either Mr. Hopper or Mr. Carnahan?

A I talked to Mr. Carnahan on the phone, I think, just that one time, possibly twice, when he asked me to come to the sentencing. And I met with them on the day of the sentencing.[1]

Attorneys Hopper and Carnahan and their law firms filed motions for summary judgment contending that as a matter of law Martha Parker was not their client at any time relevant to this cause of action. Both Hopper and Carnahan swore that they had not represented Martha Parker on the matter in question. In the excerpt from Martha Parker's deposition, she testified that she was never told that the attorneys were not representing her and that her only relevant encounter with the attorneys was on the occasion when she went to one of the attorney's office to sign the tax returns. Throughout her testimony, she makes reference to Hopper and Carnahan as her husband's attorneys. Martha Parker clearly testified that she understood from the meeting that the tax returns needed to be filed so that the IRS and the judge (in her husband's case) "would look on this in the most favorable light."

■ The relationship of attorney and client is usually not a difficult matter for the client to establish, but the duty owed by the attorney to the client is often an issue contested at trial. Ward, *Legal Malpractice in Texas* 19 S.Tex.L.J. 587, 604 (1978). The legal relationship of attorney and client is purely contractual and results from the mutual agreement and understanding of the parties concerned, based upon the clear and express agreement of the parties as to the nature of the work to be undertaken and the compensation agreed to be paid therefor. Annot., 45 A.L.R.3d 1181, 1204 (1972). The contract of employment may be implied by the conduct of the two parties. *Prigmore v. Hardware Mutual Ins. Co. of Minnesota,* 225 S.W.2d 897 (Tex.Civ.App.–Amarillo 1949, no writ). All that is required is that the parties explicitly or by their conduct manifest an intention to create the attorney-client relationship. *Nolan v. Foreman,* 665 F.2d 738 (5th Cir.1982).

■ In the present case, the fact that the communications and the signing of the returns took place in the office of either Hopper or Carnahan[2] does not establish an attorney-client relationship. The filing of the late income tax returns was a matter incidental to the representation of Martha Parker's husband in the criminal action. The statements made by the attorneys concerning the need to file these late returns and the probability that Martha Parker would not be indicted were statements made in conjunction with the attorneys' representation of Dr. Parker. According to the undisputed evidence, there was no contract creating an attorney-client relationship between the attorneys and Martha Parker, and such a relationship cannot be inferred from the conduct of Martha Parker and the attorneys.

Except for matters involving fraud or dangerous conduct constituting a breach of duty owed to the general public, Texas courts have generally recognized that a non client has no cause of action against an attorney for negligent performance of legal work. This is based upon a lack of privity between them. *First Municipal Leasing v. Blankenship, Potts, Aikman, Hagin and Stewart,* 648 S.W.2d 410 (Tex.App.–Dallas 1983, writ ref'd n.r.e.); *Bell v. Manning,* 613 S.W.2d 335 (Tex.Civ.App.–Tyler 1981, writ ref'd n.r.e.); *Bryan & Amidei v.*

---

1. Martha Parker does *not* contend that there was any discussion relevant to this suit when she came for her husband's sentencing.

2. At one point in her deposition, Martha Parker testified that she was not sure whose office she went to.

*Law,* 435 S.W.2d 587 (Tex.Civ.App.–Fort Worth 1968, no writ).

Under the terms of the decision in *United States v. Kovel,* 296 F.2d 918 (2d Cir.1961), the Federal court determined that the attorney-client privilege would apply to an accountant who claimed the privilege through the employment by attorneys on behalf of the client. Thus, an attorney may employ an accountant for the client's benefit in order for communications from the client to qualify for the attorney-client privilege. This does not make the accountant an agent of the attorney. Basic principles of agency law would be applicable, and this agency would have to be determined on the basis of the attorney's control of the work done by the accountant. In the present case, the undisputed summary judgment evidence shows that the attorneys had no control over the work done by the accountant.

The general rule is that in absence of evidence that the attorney knew that the parties had assumed that he was representing them in a matter, the attorney had no affirmative duty to inform the person that he was not their attorney. *Dillard v. Broyles,* 633 S.W.2d 636 (Tex.App.–Corpus Christi 1982, writ ref'd n.r.e.), *cert. denied,* 463 U.S. 1208, 103 S.Ct. 3539, 77 L.Ed.2d 1389 (1983). On the other hand, an attorney can be held negligent where he fails to advise a party that he is not representing them on a case where the circumstances lead the party to believe that the attorney is representing him. *Rice v. Forestier,* 415 S.W.2d 711 (Tex.Civ.App.–San Antonio 1967, writ ref'd n.r.e.).

While we believe that the evidence negates the showing of an attorney-client relationship between the attorneys and Martha Parker, we find there is a fact issue on whether the attorneys were negligent in failing to advise Martha Parker that they were not representing her interests. This duty to so advise would arise if the factfinder determined that the attorneys were aware or should have been aware that their conduct would have led a reasonable person to believe that she was being represented by the attorneys.

We turn next to the allegation that the attorneys exercised undue influence over Martha Parker. One of the requirements for the finding of undue influence is that the influence used overcame her free agency and free will and substituted the will of another so as to cause her to do what she would not have otherwise done but for such dominion and control. *Bailey v. Arlington Bank & Trust Co.,* 693 S.W.2d 787 (Tex.App.–Fort Worth 1985, no writ); *B.A.L. v. Edna Gladney Home,* 677 S.W.2d 826 (Tex.App.–Fort Worth 1984, writ ref'd n.r.e.). The evidence indicates that Martha Parker was a well-educated lady who worked in a law office and as a teacher. As a matter of law, the evidence indicates that there was no undue influence exerted upon her. There is no evidence that the attorneys destroyed her free agency and compelled her to sign the joint return against her will.

Furthermore, the evidence negates the allegations of fraud. Martha Parker contends that she was defrauded because she was told that she had to sign the documents promptly. The record clearly indicates that Martha Parker understood the purpose of signing the tax returns and the need for them to be filed prior to the sentencing. The evidence indicates nothing deceitful was said by the attorneys.

Counsel for Martha Parker compares this case to a case involving liability insurance and urged that the attorneys and the accountant were hired by Dr. Parker on behalf of Martha Parker. The difference is that through the insurance policy the insured had designated the insurance carrier as his agent for purposes of handling the defenses of the suit. *Ranger County Mutual Insurance Co. v. Guin,* 704 S.W.2d 813 (Tex.App.–Texarkana 1985), *aff'd,* 723 S.W.2d 656 (Tex.1987). On the other hand, as a general rule, neither spouse is regarded by law as a general agent of the other, *Wilkinson v. Stevison,* 514 S.W.2d 895 (Tex.1974), and there is nothing in the record to indicate that Martha Parker had given Dr. Parker any authority to act as her agent.

It is an undisputed fact that work was done for the community of Dr. Parker and Martha Parker in the preparation of the income tax returns. The tax returns were not a service of the attorneys, but were a service performed by the accountant, Jackson. Attorney's services are covered by the DTPA, *Lucas v. Nesbitt*, 653 S.W.2d 883 (Tex.App.–Corpus Christi 1983, writ ref'd n.r.e.), but in the present case, the attorneys' services were rendered only for Dr. Parker.

The undisputed evidence indicates that Jackson never had any contact with Martha Parker, and there is no evidence to show that he unduly influenced her in any way. According to the undisputed evidence, Jackson received the information for the preparation of the tax returns from Dr. Parker, and Jackson was not told to prepare joint returns, but did so based upon Dr. Parker's furnishing him with Martha Parker's W–2 forms. Jackson testified that he was not given any instructions by Carnahan or Hopper concerning the preparation of the tax returns.

Any person who prepares a substantial portion of an income tax return for compensation is automatically classified as an income tax preparer under 26 U.S.C.A. § 7701(a)(36)(A) (West Supp.1989). Federal law does not impose professional skill requirements. Tax preparer status neither suggests nor confers a standard of legal competence. Among the variegated and ill-regulated body of entrepreneurs who ply the trade of income tax preparation, there is no uniform standard. *Swayze v. United States*, 785 F.2d 715 (9th Cir.1986). On the other hand, accountants are considered to be skilled professionals in taxes. They are subject to the same rules of liability in the practice of their profession as are members of other skilled professions and are measured by a standard of care which is applicable to their profession. 1 J. Edgar and J. Sales, *Texas Torts and Remedies*, § 12.20, citing, *Atkins v. Crosland*, 406 S.W.2d 263 (Tex.Civ.App.–Fort Worth 1966), *rev'd on other grounds*, 417 S.W.2d 150 (Tex.1967).

We cannot say as a matter of law whether Jackson was negligent in failing to advise Martha Parker on the consequences of signing the joint income tax returns for the years in question. This would be a fact question for the jury.

Jackson contends that Parker did not give the notice required by the DTPA. However, he offered no summary judgment proof of this allegation.

Jackson further contends that Martha Parker was not a consumer and thus ineligible to bring a deceptive trade practice action. Suit on a violation of the DTPA is only available if brought by a consumer under the definition provided in the Code.[3] One requirement is that the person must have sought or acquired goods or services by purchase or lease. *Cameron v. Terrell & Garrett*, 618 S.W.2d 535 (Tex.1989); *Riverside National Bank v. Lewis*, 603 S.W.2d 169, 173 (Tex.1980). The deposition testimony of Martha Parker conclusively proves by her admission that she never sought the services of Jackson. The most that can be said is that the services were purchased by Dr. Parker.

A direct reading of the DTPA definition of "consumer" would appear to exclude Martha Parker from status as a consumer because it is conclusively proven that she did not seek a service and did not personally purchase or lease any service from either the attorneys or the accountant. However, the Texas Supreme Court in *Kennedy v. Sale*, 689 S.W.2d 890 (Tex. 1985), discussed this definition and broadly held that a purchase consummated for the benefit of a third party makes that third party a consumer under the required liberal construction of the Act. "A plaintiff establishes his standing as a consumer in terms of his relationship to a transaction, not by a contractual relationship with the defendant. The only requirement is that the goods or services sought or acquired by the consumer form the basis of his complaint." *Kennedy, citing, Flenniken v. Longview Bank & Trust Co.*, 661 S.W.2d

---

3. In June 1984, at the time of the meeting, the DTPA defined "consumer" as "an individual ... who seeks or acquires by purchase or lease, any goods or services."

**159**

705 (Tex.1983). The only distinction which can be drawn between *Kennedy* and our present situation is that *Kennedy* concerned a situation in which an insurance policy was purchased by an employer specifically for the benefit of the employee. In the present case, the services were expressly purchased for the husband and service was also rendered to the plaintiff. We find that this distinction would not preclude Martha Parker from being a consumer under the DTPA.

 We do determine, however, that the three subparagraphs of Section 17.46(b) of the DTPA which were included in Martha Parker's pleadings are not applicable to the situation presented by the summary judgment evidence. Martha Parker contends that the tax returns cause "confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services." It is undisputed in evidence that Martha Parker clearly understood that these were joint tax returns for her and Dr. Parker. Martha Parker further contends that Jackson represented that the goods or services had "sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities" which they did not have. According to the undisputed evidence, there were no such false representations. Martha Parker further alleges that Jackson failed to disclose information concerning goods or services which was known to him at the time of the transaction. However, to come within this provision, additional proof is required that such a failure to disclose was intended to induce the consumer to enter into a transaction in which the consumer would not have entered had the information been disclosed. The evidence shows no motive or reason for Jackson to wish to induce Martha Parker to sign the returns. The evidence shows that this was the type of return that the Parkers had customarily filed. Section 17.-46(b) of the DTPA is applicable to a seller failing to disclose so that he can induce someone into purchasing his goods or services. This is clearly negated by the circumstances set forth in the summary judgment evidence.

We find that the trial court committed harmful error in granting summary judgment because of the material issues of fact that we have pointed out. We remand the case to the trial court for a trial on the issues of whether the attorneys were negligent in failing to advise Martha Parker that they were not representing her interests and whether accountant Jackson was negligent in failing to advise Martha Parker of the consequences of signing the joint income tax returns for the years in question.