**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

No. 97-11377

SMWNPF HOLDINGS, INC.,

Plaintiff-Appellant,

versus

STEWART DEVORE, JR.; MEG A. CARRELL;
and DEVORE & CARRELL, P.C.,

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Texas

January 28, 1999

Before REYNALDO G. GARZA, STEWART and PARKER, Circuit Judges.

CARL E. STEWART, Circuit Judge:

This diversity malpractice case comes to us after the grant of summary judgment in favor of

attorney Stewart DeVore, Jr. ("DeVore") and his partner in the firm of DeVore, Nokes & Carrell,

P.C., Meg A. Carrell ("Carrell") (collectively, "the Appellees").[1]   At the core of this case is the

---

[1] This case is something of a continuation of litigation in the Eastern District of Virginia styled
Larken Management, Inc. v. SMWNPF Holdings, Inc.  In that case, Larken brought suit against
Holdings to enforce language in a September 1991 assignment—that Holdings would acquire a
Tennessee hotel "in trust" for Larken Hotels Limited Partnership ("LHLP") and would "convey" the
property to LHLP at some later time.  The district court found against Larken on all issues, and the
Fourth Circuit affirmed in an unpublished disposition.  This assignment is also at the heart of the

plaintiff's (SMWNPF Holdings,[2] or "Holdings") assertion that it had formed an attorney-client relationship with DeVore and Carrell during a real estate transaction and that the attorneys subsequently breached their fiduciary duty to Holdings. The district court found that there was no issue of material fact and thus determined the case as a matter of law, holding that no attorney-client relationship existed and, thus, no duty was breached. We agree with that conclusion and affirm the judgment of the district court.

## BACKGROUND

I.    *Backdrop to the Malpractice Claim*

The factual background to this case concerns Holdings' purchase of the Nashville Doubletree Hotel ("Doubletree") in September 1991 for $7 million. The purchase occurred pursuant to an assignment from a limited partnership, Larken Hotels Limited Partnership ("LHLP"), which previously had held the right to purchase the hotel. Holdings' parent, the NPF, had been one of LHLP's limited partners since February 1990, along with Larken, Inc. ("Larken"), which held the larger share of LHLP. DeVore and Carrell, who had represented Larken for years before this transaction, prepared the assignment and other closing documents for the transaction.

---

instant litigation and is discussed at length below.

The parties are also involved in litigation over the ERISA consequences of other deals in which they mutually engaged, and the Fourth Circuit recently found in favor of Larken on several ERISA claims. See LeBlanc v. Cahill, 153 F.3d 134 (4th Cir. 1998).

[2] Holdings is a Delaware corporation with its principal office in Virginia at the headquarters of its parent, the Sheet Metal Workers' National Pension Fund ("NPF" or "Fund"). The Fund is an employee pension benefit plan subject to regulation under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*

DeVore, Nokes & Carrell is a Texas law firm whose principals are Texas residents.

2

As finally executed, the assignment provides that Holdings was to use "its funds to acquire the [Doubletree] in trust for" LHLP and that Holdings would "subsequently convey" the Doubletree to LHLP or to a subsidiary thereof.

Holdings maintains in this action that it had no intention to convey the hotel to LHLP and that the language should not have appeared in the assignment. The language at issue, Holdings claims, was included as the result of a mutual mistake and did not comport with the intention of the parties. According to Edward I. Williams ("Williams"), Holdings' representative who signed the agreement, the mistake arose from the fact that two versions of the assignment were in circulation simultaneously: in one (prepared in August 1991) (the "August version"), the "trust" and "conveyance" language appeared, while in the second (prepared in September 1991) (the "September 'A' version"), that language was deleted pursuant to Holdings' objections. Although Larken's president, Lawrence A. Cahill ("Cahill"), had signed both versions, Williams executed only the August version.[3] Williams now claims that he thought he was signing a September "B" version, now known to be a phantom instrument, which he believed was the September "A" version further revised by the inclusion of a subordination provision that had been erroneously omitted from that version, but which had been included in the August version.[4]

Larken, by contrast, maintains that the August version reflected the actual intent of the parties: that LHLP be the ultimate owner of the hotel. Cahill testified that even though it was decided

---

[3] Williams signed the agreement on September 27, 1991, more than three weeks after the second version had been prepared.

[4] In reality, DeVore and Carrell merely changed the Management Agreement to reflect the subordination provision and forwarded that Agreement to Williams; there was never a September "B" version.

in late August 1991 that the hotel would initially be acquired by Holdings, the deal further involved Holdings' transferring title to LHLP once the NPF's trustees gave the necessary approval.

Holdings claims that Cahill's testimony is inaccurate and that, instead, Cahill was fully aware that the assignment actually agreed upon was the second version, which deleted the "trust" and "conveyance" language placing an obligation on Holdings to convey title to LHLP. Certain documents in the record lend credence to the view that Larken considered the September 1991 version to represent the actual intent of the parties. Furthermore, Holdings alleges, the parties behaved as if the transfer were a complete assignment of all of Larken's interest in the hotel to Holdings. Indeed, even prior to Williams' signing the assignment on September 27, title to the hotel was conveyed to Holdings and recorded (on September 25); this closing occurred after Williams informed Carrell that Holdings would subsequently convey the hotel to LHLP only if "Larken develop[ed] and implement[ed] an acceptable plan for the future operation of LHLP" (on September 23).

Holdings also insists that the behavior of the parties after the closing reflects their true intentions. From the period of the closing through January 1994, LHLP experienced cash flow problems and eventually filed for bankruptcy; however, neither LHLP nor Cahill made a demand upon Holdings to convey the hotel to LHLP until March 1996, despite the fact that the appraised value of the hotel would have rectified the pre-bankruptcy difficulties. Instead, the demand was made only after NPF commenced a suit against Larken and Cahill concerning NPF's investment in LHLP. In addition, LHLP did not list an ownership interest in the Doubletree on its Chapter 11 schedule of assets, and Larken even offered to buy the hotel from Holdings in 1994. Holdings asserts that this

4

was the case because the parties only discovered the mutual mistake in 1996 as a result of discovery in the Eastern District of Virginia lawsuit.[5]

II.     *The Alleged Malpractice*

The factual scenario that Holdings considers malpractice is actually quite intricate and complex, but it can be summarized in brief as follows. DeVore has represented Larken since the mid-1970s, and he represented LHLP in connection with that company's efforts to acquire hotels in 1990, including the initial acquisition of the Doubletree. According to Holdings, most of DeVore's legal work involved the representation of Larken.

In 1990, the NPF, Larken, and Larken Properties, Inc. ("LPI") entered into an agreement whereby the NPF would loan money to the Larken companies to purchase hotels in exchange for half-ownership in the hotels and other consideration. DeVore and Carrell were responsible for preparing the documents necessary to enable the acquisition of the Doubletree to go forward, including the loan documents.[6] In late August 1991, the final discussions between Holdings and Larken confirmed that the Doubletree purchase would go forward.[7] DeVore was present at that meeting, and he orally indicated that he "could represent Holdings in the closing of this transaction;" Holdings now claims that it took this statement to mean that DeVore was its attorney, since the title to the Doubletree was going solely to Holdings.

---

[5] It is worth noting that what Cahill thought to be the case with respect to the dueling assignments is not particularly relevant to the malpractice case at bar.

[6] At about the same time, the financial prospects of LHLP began to sour, and the NPF determined that the Doubletree purchase would be its last in conjunction with Larken until the situation with LHLP improved.

[7] The parties determined at this meeting that the title would remain with Holdings "until [LHLP] is a viable entity."

DeVore and Carrell contend that they never represented Holdings, but merely that they were performing services for Holdings to accomplish the closing, specifically, that they were simply negotiating the contracts and preliminary drafts of the conveyance documents on behalf of LHLP. All other work performed was, according to DeVore, purely of an administrative nature.

After the meeting, DeVore prepared the August version of the assignment and sent it to Holdings and LHLP for execution. Holdings objected to the "trust" and "conveyance" language and indicated to LHLP that it wished the wording changed. LHLP informed DeVore that a second draft of the assignment was required, and he prepared the September "A" version, which failed to contain a subordination provision which Holdings wanted.

Following the circulation of the September "A" version, Carrell wrote Holdings requesting "general instructions on how you wish our office to proceed with this matter." Carrell also requested additional information from Holdings in order to move the closing forward. Holdings responded to this letter by chastising DeVore and Carrell for the quality of their legal services; DeVore and Carrell replied by noting that "[w]e infer from your letter that Holdings desires our office and the employees of Larken to continue to handle the pre-closing matters in the ordinary course." Thereafter, DeVore and Carrell continued to prepare the closing documents, including a corporate resolution for Holdings to accept the assignment and a certificate attesting to Holdings' officers. After this exchange, DeVore and Carrell revised the Management Agreement to reflect the subordination provision but did not revise the assignment. Holdings signed and returned the Management Agreement.

6

Shortly before the closing, Carrell contacted Holdings' representative requesting the signed assignment; claiming now that he thought that he was executing a September "B" version, Williams instead faxed the August version, which contained the "trust" and "conveyance" language.[8]

The assignment did not rear its head again until discovery in the Eastern District of Virginia lawsuit in 1996, where Larken attempted to have the hotel conveyed to it. Following victory at the district court in that case, Holdings instituted this action in the Northern District of Texas in early 1997.

III.    *Procedural History*

On October 6, 1997, the district court granted summary judgment in favor of DeVore and Carrell, denying Holdings' summary judgment motion on the issue of liability.[9] The court held that, as a matter of law, Holdings could not establish that DeVore and Carrell represented Holdings since such a relationship could not have been formed until "after LHLP assigned its purchase rights to" Holdings, and here the "assignment was not complete until the agreement was signed by" Holdings at the end of September 1991. The court also held that, "[s]ince there was no attorney-client relationship, there cannot have been a conflict of interest."

The district court also concluded that DeVore and Carrell had not committed malpractice because "the undisputed evidence shows . . . that [DeVore and Carrell] had no reason to believe that Williams [Holdings' representative] had made a mistake in executing the earlier version of the

---

[8] In December 1996, DeVore executed an affidavit in which he stated that the September "A" version reflected the intention of the parties: that the Doubletree would eventually be conveyed to LHLP.

[9] Holdings had claimed that undisputed evidence compelled the conclusions that DeVore and Carrell represented Holdings and had breached their fiduciary duty to it.

7

agreement . . . . They knew that Williams was a sophisticated, as well as demanding, businessman and the document he signed was short, to the point, and needed no explanation." Furthermore, the court reasoned, "parties have an obligation to protect themselves by reading what they sign." See American Employers' Ins. Co. v. Aiken, 942 S.W.2d 156, 161 (Tex. Ct. App. 1997). Finally, the court observed that DeVore and Carrell were not negligent in failing to inform Holdings that they did not represent it.[10]

## DISCUSSION

*Standard of Review*

We exercise *de novo* review of the grant of a summary judgment. See Wenner v. Texas Lottery Comm'n, 123 F.3d 321, 324 (5th Cir. 1997). Summary judgment shall be entered in favor of the moving party if the record, taken as a whole, "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A factual dispute is "genuine" where a reasonable jury could return a verdict for the nonmoving party. See Crowe v. Henry, 115 F.3d 294, 296 (5th Cir. 1997). If the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, then there is no genuine issue for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 547, 597 (1986).

## I.    The Legal Standard in a Malpractice Action

Neither party disputes that the legal standards are clear in this area: in Texas, a legal malpractice action "sounds in tort and is governed by negligence principles." Barcelo v. Elliott, 923

_____

[10] The court concluded that DeVore and Carrell did not have an affirmative duty to inform Holdings and that, at any rate, the September 9 letter stating that they represented LHLP "served as notice that [DeVore and Carrell] were not representing" Holdings.

S.W.2d 575, 579 (Tex. 1996). In order to win a legal malpractice action, a plaintiff must show that "there is a duty owed to him by the defendant, a breach of that duty, that the breach proximately caused the plaintiff injury and that damages occurred." Cosgrove v. Grimes, 774 S.W.2d 662, 665 (Tex. 1989).

Before any duty can arise, however, there must be an attorney-client relationship. See Barcelo, 923 S.W.2d at 577, 579; see also Yaklin v. Glusing, Sharpe & Krueger, 875 S.W.2d 380, 383 (Tex. Ct. App. 1994). The attorney-client relationship is contractual. See Yaklin, 875 S.W.2d at 383; Parker v. Carnahan, 772 S.W.2d 151, 156 (Tex. Ct. App. 1989). The parties both must understand and mutually agree to "the nature of the work to be undertaken." See Parker, 772 S.W.2d at 156; see also Duval County Ranch Co. v. Alama Lumber Co., 663 S.W.2d 627, 633 (Tex. Ct. App. 1983) (recognizing that an attorney is a "special" agent, whose power and authority is confined to "those powers necessary to the proper fulfillment of the duties cast upon him by such employment"). Moreover, this determination—whether a contract exists—must be based on an objective standard, and not on what the parties subjectively believed. See Vinson & Elkins v. Moran, 946 S.W.2d 381, 406 (Tex. Ct. App. 1997).

An attorney-client relationship arises when an attorney agrees to render professional services for a client. See Yaklin, 875 S.W.2d at 383; Parker, 772 S.W.2d at 156. Once the parties enter into an attorney-client relationship, the attorney owes fiduciary duties to his client. See Willis v. Maverick, 760 S.W.2d 642, 645 (Tex. 1988). A conflict of interest among clients may give rise to an attorney's duty to withdraw from a representation. Absent consent, an attorney must discontinue employment if he is required to represent one or more clients who may have differing interests. See TEXAS STATE BAR R., art. XII, S 8, DR 5-105(B) (Tex.Code of Prof'l Resp.), 35 TEX. B.J. 758

9

(1971, superseded 1990); <u>Baptist Memorial Hosp. Sys. v. Bashara</u>, 685 S.W.2d 352, 356 (Tex. Ct. App. 1984); <u>Lott v. Ayres</u>, 611 S.W.2d 473, 476 (Tex. Ct. App. 1981).

Generally, in the absence of evidence that the attorney knew a party had assumed he or she was representing it in a matter, the attorney has no affirmative duty to inform the party that he is not its attorney. <u>See</u> <u>Parker</u>, 772 S.W.2d at 157; <u>Dillard v. Broyles</u>, 633 S.W.2d 636, 643 (Tex. Ct. App. 1982). An attorney can, however, be held negligent where he fails to advise a party that he is not representing it on a case where the circumstances led the party to believe that the attorney was providing representation. <u>See</u> <u>Parker</u>, 772 S.W.2d at 157; <u>Rice v. Forestier</u>, 415 S.W.2d 711, 713 (Tex. Ct. App. 1967).

## II.      Holdings' Contention That Material Issues of Fact Exist

Holdings bases this appeal on its contention that the district judge improperly weighed the evidence and made credibility determinations in deciding the competing motions for summary judgment, something that he is proscribed from doing. <u>See</u> <u>Crowe</u>, 115 F.3d at 296. Holdings contends that an attorney-client relationship between Holdings and DeVore and Carrell began on August 23, 1991, the date that DeVore agreed to prepare the documents necessary to substitute Holdings as the purchaser of the Doubletree and to allow the closing to proceed on schedule.

DeVore and Carrell contest this characterization of their services. They admit that they agreed to "stay involved" by substituting Holdings in the seller's documents, but insist that their services were only of an administrative nature. Holdings believes that DeVore and Carrell performed many more legal services for it over the course of the next month: preparing several versions of the assignment; communicating with Holdings through the closing and asking Holdings how to proceed; requesting information from Holdings that it intended to relay to the seller; providing filing

10

information to Holdings; receiving confidential business plans from Holdings; preparing corporate documents for Holdings to permit the assignment and purchase; preparing the Management Agreement; reviewing the sale documents and attending the closing as the buyer's representative. In exchange for this work, DeVore and Carrell billed Holdings, and Holdings believes that its receipt of this invoice serves as proof positive that the law firm represented it (Blue Br. at 34).

The district court concluded that Holdings was not represented by DeVore and Carrell during this period; only after LHLP assigned its purchasing rights to Holdings could the Appellees have represented Holdings. Prior to that time, the Appellees were representing the Larken companies, their clients for almost two decades, in an effort to obtain the most favorable closing possible. It is axiomatic that, in the context of the relationship between these two corporate entities, Larken and Holdings, the same attorneys could not have been zealous advocates for both sides to the negotiation. Holdings contends that this ruling was reached by an impermissible weighing of evidence and the making of credibility determinations. As support for this conclusion, Holdings points to the district court's observation that, since the Appellees clearly indicated to all involved that they represented LHLP prior to the closing, there was no retroactive attorney-client relationship. Although Holdings is correct to observe that "[j]ust because an act is prohibited or involves a potential violation of the disciplinary rules [the representation of both parties to a closing, a proscribed conflict] does not mean that it cannot or did not occur," Vinson & Elkins, 946 S.W.2d at 402, there is simply no evidence put forward by Holdings that Appellees held themselves out as Holdings' counsel. Indeed, it was not until years later—when the mistake in the contract was discovered—that Holdings began to pursue this theory that DeVore and Carrell had represented it during the transaction.

11

The court further held that the fact that Holdings paid the closing costs, including attorneys' fees, is irrelevant to whether DeVore and Carrell represented Holdings. This was not the first time that Holdings had worked with LHLP or these attorneys, and it is not at all unusual for one party to pay the costs of a closing; that does not imply that the attorneys whose fees are paid are necessarily representing the payor.

## III. DeVore and Carrell's Alleged Negligence

Holdings asserts that DeVore and Carrell should have dissuaded Holdings of the opinion that they represented it. Williams, Holdings' representative, claims that he thought the firm represented Holdings and that his failure to attend the closing is linked to the fact that he thought his attorneys, i.e., DeVore and Carrell, would handle the matter. The district court found that there is nothing in the record that could lead a reasonable trier of fact to conclude that Holdings was represented by DeVore and Carrell and that, therefore, DeVore and Carrell had no duty to inform Holdings that they were not representing it. Furthermore, DeVore and Carrell had no reason to think that Holdings believed them to be its counsel for this transaction.

In denying Holdings' summary judgment motion on this issue, the district court considered the evidence before it. Holdings asserts that this constituted "impermissible" weighing of the evidence and "credibility determinations" on the part of the ditrict court, but Holdings has taken the proscription against weighing evidence too far—the district judge may certainly *review* the evidence before him to determine whether an issue of material fact exists. "Weighing the evidence" would involve determining whether it was more likely than not that an issue of fact existed, but this the district judge did not do. He determined that an issue of fact *did not* exist, which is not, of course, "weighing the evidence" or making "credibility determinations:" he concluded that there was "no

12

summary judgment evidence of any event" that supported Holdings' point of view and that, consequently, no reasonable trier of fact could find for Holdings. Support for this conclusion lies in unequivocal correspondence from DeVore and Carrell to Holdings during this time period indicating that it represented LHLP. This action is surely not forbidden; if it were, then no district court could ever grant summary judgment.[11]

## ANALYSIS

No previous Texas case corresponds closely to these facts. While other cases have considered an attorney's role in a closing where the attorney prepares documents for both sides, see, e.g., Yaklin, 875 S.W.2d at 383-84, no case on record involved a dispute in which both sides were sophisticated business entities and where the attorneys at issue were widely recognized by all parties as representing only one of the parties. Given the facts before the court today, however, we conclude that no attorney-client relationship existed and that DeVore and Carrell were not negligent with respect to Holdings. Since Holdings' argument is not persuasive under settled Texas law, we affirm the district court's judgment.

While the "practice of law embraces in general all advice to clients and all action taken for them in matters connected with the law," Brown v. Unauthorized Practice of Law Committee, 742 S.W.2d 34, 41 (Tex. Ct. App. 1987), the dispute here is not over whether DeVore and Carrell were "practicing law" when they prepared for and attended the closing, but rather whether they were

---

[11] Holdings also alleges that DeVore and Carrell negligently represented it by not verifying that Williams had signed the correct instrument. Of course, since DeVore and Carrell never had an attorney-client relationship with Holdings, they could not have negligently represented them.

Holdings argues that DeVore and Carrell should have made certain that the correct instrument was signed, but they assumed that the instrument that Williams, a responsible and prudent businessman, signed *was* the correct one. The negligence argument thus unravels as a specious one.

representing Holdings when they did so. Holdings conflates these two issues—what constitutes the practice of law and whether Holdings was represented by the Appellees—throughout its argument.

Holdings urges the court that DeVore and Carrell have not carried their burden of "proving the *non-existence* of the [attorney-client] relationship as a matter of law," Yaklin, 875 S.W.2d at 383, which the district court held that they had. Although Holdings draws our attention to several Texas cases where an attorney-client relationship was held to exist, see, e.g., Vinson & Elkins, 946 S.W.2d at 400-05 (finding an attorney-client relationship); Burnap v. Linnartz, 914 S.W.2d 142, 150 (Tex. Ct. App. 1995) (finding the question to be one for the trier of fact); Yaklin, 875 S.W.2d at 383-84 (same); Kotzur v. Kelly, 791 S.W.2d 254, 258 (Tex. Ct. App. 1990) (same), none of these cases is directly on point, particularly given that there is no question that DeVore and Carrell were practicing law and performing legal services at the closing. In none of these cases, nor in any prior Texas case, was there a situation where the same attorney represented two parties to a closing.

We find persuasive the fact that, as the district court concluded, there may have been an attorney-client relationship between the Appellees and Holdings, but if there were, it did not come about until after LHLP assigned its purchase rights to plaintiff, i.e., after Holdings signed the document in late September. Even taking the facts in the light most favorable to Holdings, including Williams' contention that he thought he was signing the September "B" version,[12] the crux of Holdings' argument—that DeVore and Carrell promised to have a "continuing involvement"—is simply not dispositive. After all, there is no question but that the firm represented LHLP in the closing; naturally, they would be involved in the transaction. That DeVore and Carrell solicited

---

[12] As indicated above, Williams' belief about which assignment he executed has nothing to do with whether Devore and Carrell *represented* Holdings.

14

information from Holdings and filed documents on its behalf were simply parts of its overall representation of LHLP; it was facilitating the transaction to benefit its client and necessarily had a number of interactions with the third party, Holdings. Similarly, and as addressed above, the fact that Holdings paid the fees is irrelevant to a determination whether Holdings was represented by DeVore and Carrell. The agreement was for Holdings to pay the attorneys' fees, just as a borrower often pays a lender's fees; in neither case does a presumption arise that the party paying the fees is a client of the attorney's.

Even though Cahill's and DeVore's belated claim that they believed all along that the assignment contained the "trust" and "conveyance" language is unpersuasive—if this is so, why did the Larken companies not make demand on the hotel during LHLP's Chapter 11 filing in 1994?—we are satisfied that, regardless of what DeVore and Carrell believed the assignment provided, there is no evidence in the summary judgment record supporting Holdings' contention that DeVore and Carrell were its counsel. That question—the attorney-client relationship—is what drives the present suit, not what the assignment provided.[13]

## CONCLUSION

For the foregoing reasons, as well as the explanations provided by the court below, the judgment of the district court is AFFIRMED.

---

[13] This lawsuit appears on its face to be a sort of retaliation for Larken's tactics in the suit in the Eastern District of Virginia. It appears that Larken made the serendipitous discovery in that lawsuit that Holdings had inadvertently signed the wrong document; it therefore tried to wrest ownership from Holdings on that basis. Holdings then instituted this suit for similarly clouded motives, taking out of context certain verbal expressions and letters from DeVore and Carrell to argue, years after the fact, that it was represented by that law firm. Both suits strike us as disingenuous on the facts, yet we need not decide that the case before us is frivolous. In point of fact, the law is simply against Holdings.

15