NUMBER 13-99-623-CV



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI


___________________________________________________________________


JOSEPH H. SUTTON
, Appellant,


v.



ESTATE OF A.F. MCCORMICK, 

DECEASED AND FRANCES ANN 

MCCORMICK, INDEPENDENT 

EXECUTRIX OF THE ESTATE OF 

A.F. MCCORMICK
, Appellees.

___________________________________________________________________


On appeal from the 357th District Court


of Willacy County, Texas.


___________________________________________________________________


O P I N I O N



Before Justices Dorsey, Rodriguez, and Seerden(1)


Opinion by Justice Dorsey



 This is an appeal of a take-nothing judgment entered after a jury
verdict in a legal malpractice case. Joseph Sutton sued attorney A.F.
McCormick for legal malpractice, claiming that McCormick was
negligent in preparing certain legal documents related to a transaction
between Sutton and Texas Ostrich Company. Sutton claims that the
loan documents prepared by McCormick contained a usurious rate of
interest, and as a result, Sutton was sued on the note and ultimately
lost money. Attorney McCormick died while the suit was pending, and
his estate was substituted for him as a party.(2)

 We hold that the issues in this case were properly submitted to
the jury and that sufficient evidence supports its verdict. Accordingly,
we AFFIRM the judgment of the trial court.

 The first question submitted to the jury stated:

 At the time in question, was Joseph Sutton a client of A.F.
McCormick with respect to the matter in dispute?


By his first eight points of error, Sutton argues that there was no
evidence, or factually insufficient evidence, to justify submission of this
question. During oral argument, Sutton conceded that if that issue was
properly submitted to the jury, all his other points of error must
necessarily fail. We hold that the evidence was sufficient to submit the
question to the jury and that the jury's answer that such a relationship
did not exist was not against the great weight and preponderance of
the evidence.(3)

 Sutton, as plaintiff, had the burden to prove the existence of an
attorney-client relationship between himself and Attorney McCormick. 
Yaklin v. Glusing, Sharpe & Krueger, 875 S.W.2d 380, 383 (Tex.
App.--Corpus Christi 1994, no writ). "An attorney-client relationship
must exist before an attorney is obligated to provide proper legal
services." Moore v. Yarbrough, Jameson & Gray, 993 S.W.2d 760, 
763 (Tex. App.--Amarillo 1999, no pet.). This Court has explained:

 In order to establish liability [for legal malpractice], a
claimant must establish a duty, a breach of that duty, and
damages that result from the breach. The duty implicated is
that which an attorney owes a client, and before any duty
arises there must first be an attorney-client relationship. . .
.


 Once the attorney-client relationship is established,
numerous duties are owed the client by the lawyer, which,
among others, are to use utmost good faith in dealings with
the client, to maintain the confidences of the client, and to
use reasonable care in rendering professional services to the
client. The duties flow from the relationship . . . .


Yaklin, 875 S.W.2d at 383; accord Stephenson v. LeBoeuf, 16 S.W.3d
829, 836 (Tex. App.--Houston [14th Dist.] 2000, no pet.); Moore, 993
S.W.2d at 763; Honeycutt v. Billingsley, 992 S.W.2d 570, 581 (Tex.
App.--Houston [1st Dist.] 1999, pet. denied).

 The attorney-client relationship is a contractual relationship
whereby an attorney agrees to render professional services for a client. 
Mellon Service Co. v. Touche Ross & Co., 17 S.W.3d 432, 437 (Tex.
App.--Houston [1st Dist.] 2000, no pet.). The relationship may be
expressly created by contract, or it may be implied from the actions of
the parties. Id.; see also Burnap v. Linnartz, 914 S.W.2d 142, 148­49
(Tex. App.--San Antonio 1995, writ denied) (explaining the requirement
that a client be in privity of contract with an attorney in order to have a
cause of action for malpractice). For the relationship to be established,
"the parties must explicitly or by their conduct manifest an intention to
create it. To determine whether there was a meeting of the minds, we
use an objective standard examining what the parties said and did and
do not look at their subjective states of mind." Roberts v. Healey, 991
S.W.2d 873, 880 (Tex. App.--Houston [14th Dist.] 1999, pet. denied).

 Because the evidence did not conclusively establish that an
attorney-client relationship existed between Sutton and McCormick that
would impose the duty to inquire into the substance of the contract
rather than to serve as a mere scrivener between two parties, we hold
that the question was properly submitted to the jury. Likewise, we hold
the jury's answer to the question was not against the great weight and
preponderance of the evidence.

 Mr. Sutton testified at trial that he was living in Maine and
attempting to relocate to the South Texas area when he first came in
contact with attorney McCormick. Sutton's attorney in Maine gave him
McCormick's name out of a legal directory as someone to use in
purchasing a ranch down in South Texas. Mr. Sutton hired McCormick
to represent him in purchasing a ranch.

 Before closing on the ranch, Mr. Sutton came in contact with an
ostrich rancher, Mr. Mantzel. Sutton learned that Mantzel was having
some financial trouble, and might be interested in talking to him about
how they could work out an arrangement that would solve Mantzel's
financial problems and would enable Sutton to break into the ostrich-farming business. Mantzel flew to Maine, and within a twenty-four
hour period, Sutton and Mantzel had negotiated a deal.

 While Mantzel was in Maine visiting and negotiating the deal with
Sutton, they called attorney McCormick in Raymondville to draw up the
paperwork. Sutton testified:

 Well, I told [Mantzel], first of all, we would have to have an
attorney. I said, "I have mine. I have somebody in mind in
Raymondville." And I said -- One of the stipulations was
that he or his company [was] to pay for . . . all of my
attorney's fees to McCormick. . . . 


He then called Attorney McCormick at his office in Texas:

 . . . because I wanted Mr. McCormick to start drawing up
the contracts as we had agreed to them in my living room,
and I wanted him to have all of the information available, so
that when he got down there the following day . . .
everything would be ready to sign.


 The testimony regarding what was said during that phone call
was vague. Sutton testified that he put Mantzel on the phone to dictate
the terms of their agreement to McCormick's secretary. He then
testified as follows:

 Q. Mr. Sutton what you had been testifying to about right
at the time of the break, what was it that you discussed with
Mr. McCormick in the telephone call that you made from
your house in Maine to him in Raymondville? Could you
continue with that?

 

 A. Well, I just wanted to make sure that he would be
available to create a document to protect both Mr. Mantzel
and myself; primarily me, though, because he did represent
me. And I wanted to be sure that he understood the
contents of our agreement that we had just finished making
over the telephone. This seemed to be very urgent to Mr.
Mantzel. Time was running out on who he had to pay this
money to, and I wanted to help in that situation, not to
mention the fact that I was benefitting financially as well. 
And I also wanted to make sure that he understood that Mr.
Mantzel was going to be responsible for this. Obviously --


 Q. "For this." Do you mean the attorney's fees?


 A. Yes. Obviously, when I used to go to a bank to make a
loan, I used to pay . . . the attorney's fees that the bank
incurred, and in this case [Mantzel] was going to pay my
attorney's fees that I incurred. And it made sense and he
did.


 Q. What else was in the telephone conversation, if anything,
with Mr. McCormick?


 A. Mr. McCormick told me he better put his secretary on
because she would be typing up in draft the agreement, and
so it would be easier for her to understand it, and then she
could give it to him to review.


 Q. And did y'all then proceed to tell her the details of the
transaction?


 A. Yes, we did.


 Q. What then happened?


 A. We flew back and signed the deal. 


 Q. Did Mr. Mantzel pay for your flight?


 A. Yes, he did.


 Q. Did you go to Mr. McCormick's office when you got to
Raymondville?


 A. Yes, we did.


 Q. Is that where the documents were signed?


 A. Yes.


Sutton later testified:


 I wanted [McCormick] to be aware that he is drawing this
contract up for both parties. Even though he is representing
me, he is also wanting to protect, you know, the other party
as far as the agreements that I made to the other party in
terms of what I was going to perform. . . . He told me he
understood what I meant, and he would most definitely
protect me.


 As McCormick was deceased at the time of the trial, he was
obviously unable to give testimony regarding his understanding of the
agreement between himself and Mr. Sutton. His estate offered
testimony that McCormick's fee was paid by Texas Ostrich Company,
not by Mr. Sutton. We find that the jury was within its province in
deciding the question of whether an attorney-client relationship existed
between Sutton and McCormick with regard to the agreement between
Sutton and Texas Ostrich.

 The trial court must submit the questions, instructions and
definitions that are raised by the written pleadings and the evidence. 
Tex. R. Civ. P. 278; Gunn Infiniti, Inc. v. O'Byrne, 996 S.W.2d 854, 862
(Tex. 1999). In fact,

 A trial court may refuse to submit a question only if no
evidence exists to warrant its submission. If there is some
evidence to support a jury question and the trial court does
not submit the question, the trial court has committed
reversible error. In determining whether a trial court should
have submitted a question to the jury, the reviewing court
must examine the record for evidence supporting
submission of the question and ignore all evidence to the
contrary. Conflicting evidence presents a fact question for
the jury.


Id. (internal citations omitted).

 In filing suit against McCormick, Sutton assumed the burden to
establish by a preponderance of the evidence that he had an attorney-client relationship with McCormick. See Yaklin, 875 S.W.2d at 383. If
he offered no evidence to establish this relationship, his claim would fail
as a matter of law. The only evidence he did offer on this issue was his
own testimony. However, he was only capable of testifying about
matters within his personal knowledge. Therefore, he could not
possibly have testified regarding Attorney McCormick's understanding
of the relationship between them, except indirectly by testifying about
the circumstances surrounding the transaction. Also, the jury was free
to believe or disbelieve any or all of his testimony.

 Sutton's testimony left unclear the exact parameters of the
relationship between himself and Attorney McCormick. Even assuming
that Sutton's testimony is true, the jury could have believed that
Attorney McCormick was acting as a mere scrivener between the two
parties, or that he was--to a limited extent--representing them both. Cf.
Pondrum v. Gray, 298 S.W. 409, 412 (Tex. Com. App. 1927) (adopting
the rule that when an attorney is acting as a mere scrivener,
communications between himself and the party are not confidential);(4)
Tex. Disciplinary R. Prof'l Conduct 1.07, reprinted in Tex. Govt. Code
Ann, Tit. 2, Subtit. G App. A, (Vernon 1998) (Tex. State Bar R. art. X,
§ 9) (outlining the conditions under which "common representation" of
more than one client is permissible). In either event, McCormick would
not have been obligated to investigate legal issues raised by the
substantive terms of the agreement. While we find the evidence that
Texas Ostrich paid for McCormick's services in drafting the agreement
is of limited probative value, it is some evidence from which the jury
was free to draw reasonable inferences. But cf. SMWNPF Holdings,
Inc. v. Devore, Jr., 165 F.3d 360, 366­67 (5th Cir. 1999) (affirming grant
of summary judgment in favor of attorney in suit brought against
attorney by nonclient, holding that evidence that nonclient paid fees, as
is customary in sophisticated commercial transactions such as this,
amounted to no evidence that attorney-client relationship was formed). 
One such inferences is that McCormick was providing limited
representation to both parties, and did not owe to Sutton the
preeminent duties incumbent with a traditional attorney-client
relationship.

 Because our resolution of this point renders moot an analysis of
appellant's other points, we do not address them. Accordingly, we
affirm the trial court's judgment in all respects.

 
 J. BONNER DORSEY,

 Justice


Publish
.

Tex. R. App. P. 47.3(b).


Opinion delivered and filed

this 10th day of May, 2001.

1. Senior Justice Robert J. Seerden assigned to this court by the Chief
Justice of the Supreme Court of Texas pursuant to Tex. Gov't Code Ann. §
74.003 (Vernon 1998).
2. All references to "McCormick" denote his estate where appropriate. 
3. Because all eight of Sutton's first points of error hinge on the question
of whether the evidence was sufficient to support the jury's finding that no
attorney-client relationship existed, Sutton must meet the standards for legal
and factual sufficiency that would require the trial court to either direct a
verdict on that issue or throw out the jury's finding on it. When reviewing for
legal sufficiency, we must determine whether any evidence supports the
challenged finding. In re King's Estate, 150 Tex. 662, 244 S.W.2d 660, 661
(1951). If so, it must be upheld. Id. We consider only the evidence and
reasonable inferences that support the verdict and disregard all evidence and
inferences to the contrary. Richey v. Brookshire Grocery Co., 952 S.W.2d 515,
521 (Tex. 1997); Ellis County State Bank v. Keever, 888 S.W.2d 790, 794 (Tex.
1994). When reviewing for factual sufficiency, we must determine whether
the challenged finding is against the great weight and preponderance of the
evidence, considering and weighing all of the evidence, not just that evidence
that supports the verdict. Maritime Overseas Corp. v. Ellis, 971 S.W.2d 402,
406-07 (Tex. 1998). In reviewing the factual sufficiency, we can set aside the
verdict only if it is so contrary to the overwhelming weight of the evidence
that the verdict is clearly wrong and unjust. Id. at 407. 
4. The court explained:


 An attorney is often employed for some other purpose than to
conduct litigation, to give advice on legal questions, or to engage
in some other activity peculiarly within the province of an attorney
at law as distinguished from a person engaged in some other
pursuit. In such a case the relation of attorney and client in the
strict sense of those terms cannot be said to exist between the
attorney and the one who has engaged his services. Accordingly
communications made during the course of that employment are
not regarded by the courts as between attorney and client and are
not accorded protection from disclosure. This rule has been
applied in the case of an attorney acting as an agent for another,
as an attorney in fact, or as a notary public. So where an attorney
is employed merely to put in legal form and phrase certain
documents or agreements of the parties, the fact that he is skilled
in the law will not make him incompetent as a witness, nor can
the communications made by the parties to him be considered as
privileged. A conveyancer is not a legal adviser or a professional
adviser in any proper sense of those terms and a communication
made to a conveyancer is not privileged. This rule has been
applied to the drawing of deeds, mortgages and agreements. And
where an attorney is requested by a debtor to draw up a
mortgage deed of his personal property, and the debtor discloses
his purposes in making such a conveyance, either without any
particular motive or in order to remove any scruple the attorney
may have as to the character of the transaction, but no legal
advice is asked or given, the testimony of the attorney as to such
communications is admissible.


Pondrum, 298 S.W. at 412. See also In re Texas Farmers Ins. Exchange, 990
S.W.2d 337, 340 (Tex. App.--Texarkana 1999) (orig. proceeding), mand.
denied, 12 S.W.3d 807 (Tex. 2000) ("[T]he [communications] privilege does
not apply if the attorney is acting in a capacity other than that of an
attorney."); Burnap v. Linnartz, 914 S.W.2d at 148­49 (holding that fact
question existed regarding whether attorney-client relationship was formed
or whether attorney was acting as mere scrivener in a particular transaction).