# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 16, 2010

Lyle W. Cayce
Clerk

No. 09-10225

SUSAN HARRISON; WILLIAM G. HARRISON, III, Individually and as Trustee for the Harrison Family Trust and The Emily Waldrip Trust; TINA HARRISON; W.G. HARRISON, IV; KATHY ALLEN; PAT ALLEN; LARRY LUXENBERG; CINDY NOSSER; JOHN SHELTON,

Plaintiffs-Appellants

v.

TAFT, STETTINIUS, & HOLLISTER, L.L.P.; THOMAS E. GROSSMAN,

Defendants-Appellees

Appeals from the United States District Court
for the Northern District of Texas
USDC No. 7:06-CV-121-O

Before JOLLY and DENNIS, Circuit Judges, and JORDAN, District Judge.[*]

JAMES L. DENNIS, Circuit Judge:[**]

The Plaintiffs-Appellants ("Plaintiffs") appeal the district court's grant of summary judgment to the Defendants-Appellees ("Defendants") on Plaintiffs' malpractice and breach of fiduciary duty claims. For the following reasons we AFFIRM.

---

[*] District Judge, Southern District of Mississippi, sitting by designation.

[**] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 09-10225

**I.**

The Plaintiffs are several former shareholders of Zooth, Inc. ("Zooth"), a leading producer of children's dental hygiene products. Zooth was privately held and owned by fewer than 20 shareholders, with its chief executive officer Susan Harrison ("Harrison") and its chief financial officer Steve Nosser ("Nosser"), in combination, holding a controlling majority interest. In late 2002, Harrison and Nosser started the process of selling Zooth and, a few months later, hired the Defendants, the Ohio-based law firm of Taft, Stettinius, & Hollister, L.L.P. ("Taft") and former Taft partner Thomas E. Grossman ("Grossman"), as the Zooth shareholders' legal advisors in connection with the company's sale.

In November 2003, The Gillette Company ("Gillette") sent Zooth a Preliminary Letter of Interest, followed by a Letter of Intent outlining the envisioned terms of a sale of Zooth (the "Zooth Transaction") in February 2004. In the Letter of Intent, Gillette tentatively agreed to a cash purchase price for all Zooth shares of approximately $28 million at closing, with additional deferred compensation of 4% of certain predefined sales of Zooth products over a three-year earn-out period. Gillette also stated that it intended "to preserve and grow the Zooth brand" and "drive the growth of Zooth's business."

Over the following months, the parties negotiated the final terms of the Share Purchase Agreement ("SPA"), whereby all Zooth shares were to be sold to Gillette. The final SPA provided for an initial cash purchase price of $27,815,000 and a three-year earn-out (the "Earn-Out") of no less than $3 million and no more than $12 million. The Earn-Out was based on the sales volume of certain Zooth products. The Earn-Out period started January 1, 2005, and payments were to be made in several installments over the three-year time frame. The SPA did not contain a best efforts or change of control provision. The closing date for the Zooth Transaction was June 4, 2004.

No. 09-10225

In January 2005, shortly after the Earn-Out period had begun, Gillette announced that it had agreed to be acquired by the Procter and Gamble Company ("P&G") (the "Gillette Acquisition"). That transaction closed in October 2005. After P&G assumed operational control of Zooth, Zooth's management was reshuffled, its funding and personnel were reduced, and some of its operations were wound down.

By the end of the Earn-Out period, the Zooth shareholders had received an additional $4.058 million in deferred compensation. The Plaintiffs allege that this amount should have been much higher, closer to the $12 million Earn-Out maximum. The Plaintiffs aver that the Defendants negligently failed to ensure that the SPA contained best efforts and change of control clauses to protect their deferred compensation from the negative implications of a future transaction affecting Zooth's ability to generate revenue, and also negligently failed to advise them of the implications of an SPA lacking such provisions. The omission of these provisions, the Plaintiffs claim, resulted in Gillette (and P&G) failing to devote sufficient personnel and financial resources to maintain and further develop Zooth's business during the Earn-Out period. As a result, sales of the predefined Zooth products were far lower than expected, leading to a lower-than-expected Earn-Out. In addition, the Plaintiffs claim that the Defendants are also liable for the legal fees and costs in excess of $700,000 that the Plaintiffs incurred in pursuing claims against Gillette and P&G because the SPA lacked a best efforts and a change of control clause.[1] Lastly, the Plaintiffs contend that they are entitled to recover the legal fees paid to Taft in connection with the Zooth Transaction because the Defendants violated their fiduciary duty vis-a-vis the Plaintiffs in not disclosing the omission of these protective provisions.

---

[1] The claims against P&G and Gillette have been settled.

No. 09-10225

The district court, concluding that the Plaintiffs had failed to raise a triable issue of fact as to whether their alleged damages were proximately caused by the Defendants' alleged malpractice and breach of fiduciary duty, granted summary judgment to the Defendants. *Harrison v. Procter & Gamble Co.*, No. 7:06-CV-121-O, 2009 WL 304573, at *6-9 (N.D. Tex. Feb. 9, 2009).

## II.

We review a grant of summary judgment in a malpractice or fee forfeiture action *de novo*, applying the same standard as the district court. *Stanley ex rel. Estate of Hale v. Trinchard*, 579 F.3d 515, 517 (5th Cir. 2009); *see also Liberty Mut. Ins. Co. v. Gardere & Wynne, LLP*, 82 F. App'x 116, 118 (5th Cir. 2003) (unpublished); *SMWNPF Holdings, Inc. v. Devore*, 165 F.3d 360, 364 (5th Cir. 1999). Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A genuine issue of material fact exists where the summary judgment evidence would support a reasonable jury's verdict for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III.

### A.

"In Texas, a legal malpractice claim sounds in tort and is evaluated based on negligence principles." *Streber v. Hunter*, 221 F.3d 701, 722 (5th Cir. 2000); *accord Cosgrove v. Grimes*, 774 S.W.2d 662, 664 (Tex. 1989).[2] "To prevail on a legal malpractice claim, a plaintiff must show 'that (1) the attorney owed the plaintiff a duty, (2) the attorney breached that duty, (3) the breach proximately

_____

[2] The parties agree that Texas law applies to all of the Plaintiffs' claims.

caused the plaintiff's injuries, and (4) damages occurred.'" *Alexander v. Turtur Assocs., Inc.*, 146 S.W.3d 113, 117 (Tex. 2004) (quoting *Peeler v. Hughes & Luce*, 909 S.W.2d 494, 496 (Tex. 1995)); *accord Akin, Gump, Strauss, Hauer & Feld, LLP v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 112 (Tex. 2009); *Streber*, 221 F.3d at 722; *SMWNPF Holdings,* 165 F.3d at 364; *Simpson v. James*, 903 F.2d 372, 376 (5th Cir. 1990). Because we conclude that the Plaintiffs have failed to raise a genuine issue of material fact as to whether the Defendants' alleged malpractice proximately caused their alleged damages – "an element essential to [their] case, and on which [they] bear the burden of proof at trial," *Celotex*, 477 U.S. at 322 – we do not reach any of the other prongs.

To establish causation in legal malpractice cases, a plaintiff must show cause in fact and foreseeability. *Hall v. Stephenson*, 919 S.W.2d 454, 466 (Tex. App.-Fort Worth 1996, writ denied) (citing *Union Pump Co. v. Allbritton*, 898 S.W.2d 773, 775 (Tex. 1995)); *see also O'Donnell v. Smith*, 234 S.W.3d 135, 148 (Tex. App.-San Antonio 2007) ("To prove causation, the legal malpractice plaintiff must 'establish a direct causal link between the damages awarded, the actions of the defendant, and the injury suffered.'" (quoting *Haynes & Boone v. Bowser Bouldin, Ltd.*, 896 S.W.2d 179, 181 (Tex. 1995)), *aff'd*, 288 S.W.3d 417 (Tex. 2009). Cause in fact means that the attorney's negligence was a substantial factor in causing the alleged injury. *Hall*, 919 S.W.2d at 466. Foreseeability means that the attorney should have anticipated the injury his negligence could cause, although he need not have anticipated the precise consequences of his negligence. *Id.* Where, as here, legal malpractice is alleged in connection with the negotiation of contractual terms, a plaintiff must establish that the counter-party would have agreed to the additional or changed term(s) in the contract and that the inclusion of the term(s) would have put the plaintiff in a better position. *See Tolpo v. DeCordova*, 146 S.W.3d 678, 683-84

5

No. 09-10225

(Tex. App.-Beaumont 2004, no pet.); *accord Schlager v. Clements*, 939 S.W.2d 183, 187-88 (Tex. App.-Houston [14 Dist.] 1996, writ denied).

**B.**

The Plaintiffs argue that testimony by their expert as well as by Harrison, Nosser, and a former Gillette, and later P&G, executive raises an issue of fact as to whether the Defendants proximately caused the Plaintiffs' damages.[3] The Plaintiffs point first to the testimony of their expert, Richard Tulli ("Tulli"), who they allege opined that the Defendants' malpractice caused the Plaintiffs' damages. However, Tulli, on several occasions during his deposition, unequivocally disclaimed opining on any issues of proximate causation.[4] Tulli also conceded that he could not say that other lawyers, including those at his

---

[3] We decline, without reaching the issue, the Defendants' invitation to decide this case on the basis that the Plaintiffs failed to proffer any expert evidence on proximate causation as mandated by Texas law under the circumstances here. *See Hoover*, 196 S.W.3d at 231; *Alexander*, 146 S.W.3d at 119-20; *Cantu v. Horany*, 195 S.W.3d 867, 873 (Tex. App.-Dallas 2006, no pet.); *Indus. Clearinghouse, Inc. v. Jackson Walker, LLP,* 162 S.W.3d 384, 388 (Tex. App.-Dallas 2005, pet. denied); *Onwuteaka v. Gill*, 908 S.W.2d 276, 283 (Tex. App.-Houston [1st Dist.] 1995, no writ).

[4] When pressed at his deposition as to whether he was giving an opinion regarding causation, Tulli said he was not:

Q.    So you cannot say that any alleged act or omission of Taft proximately caused any specific amount of damage, correct?
A.    Correct.
Q.    Now your report . . . does not express any opinions concerning causation, does it?
A.    No.

\* \* \*

Q.    . . . [S]ince you have no opinions on proximate cause, you're not applying any Texas standard of proximate cause?
A.    Correct.

\* \* \*

Q.    So is it fair to say you're not expressing any opinions about proximate cause for anybody in this case?
A.    That's correct.

In another part of his deposition, Tulli repeated that he "cannot say that any alleged act or omission of Taft proximately caused any specific amount of damage."

firm, could have negotiated SPA terms more favorable to the Plaintiffs, let alone the best efforts and change of control clauses the Plaintiffs contend should have been included in the SPA, or that Gillette would have agreed to any such clauses.[5]  Similarly, while Tulli said he "suspected" that a best efforts clause would have changed P&G's conduct in the aftermath of the combination with Gillette, he conceded that it would be speculation to say so.  Other passages of Tulli's testimony to which the Plaintiffs point as opining on causation in fact discuss the standard of care and the Defendants' alleged breach thereof.  But "[b]reach of the standard of care and causation are separate inquiries, . . . and an abundance of evidence as to one cannot substitute for a deficiency of evidence as to the other.  Thus, even when negligence is admitted [which is not the case here], causation is not presumed." *Alexander*, 146 S.W.3d at 119 (citing *Haynes & Boone*, 896 S.W.2d at 181-82).

The Plaintiffs argue further that testimony by Bruce Cleverly ("Cleverly"), the former head of Gillette's oral care business who was also overseeing Zooth

---

[5] At his deposition, Tulli responded as follows:

Q.    And you can't say that hypothetical negotiations with another set of lawyers would've produced a different result had they been negotiating with Gillette over the same transaction, can you?

A.    I don't know what would have happened.

Q.    . . . So you cannot say, and it would be speculation, that if you and your colleagues at . . . Gardere [Wynne Sewell LLP] . . . had been representing Zooth, that you would've gotten any better financial terms than ultimately were given to Zooth by Gillette.

A.    I can't say what would have resulted in the contract.

Tulli also testified that he could not identify any other terms of the SPA to which Gillette would have agreed:

Q.    You cannot identify any additional term of the [SPA] to which Gillette would've agreed, correct?

A.    No, I cannot.

* * *

Q.    . . . [Y]ou can't say that Gillette would've agreed to any [best efforts or reasonble efforts provision]. . . .

A.    I don't – that's correct.  I don't know whether –

Q.    And that's just speculation on your part, right?

A.    Correct.

after Gillette acquired it, raises a triable issue of fact as to whether the Defendants proximately caused the Plaintiffs' damages.  But Cleverly's testimony primarily tends to show that Zooth's circumstances changed after Gillette was acquired by P&G; how P&G's approach to Zooth's business and personnel was different; and how the takeover affected the Plaintiffs' Earn-Out. What is lacking is any testimony as to whether Gillette would have agreed to the change in control and best efforts provisions in the first place.  *See Tolpo*, 146 S.W.3d at 682-83.  Cleverly merely speculated that Gillette "would have considered it," but when pressed further refused to even say that Gillette would have given it "favorable consideration."  He later added that Gillette had a general dislike for such clauses because they "seem to me to be very squishy things.  Like what the hell does 'best efforts' mean? . . . I know [Gillette's] lawyers in general did not like agreeing to things that were squishy or vague or that could open [Gillette] to more misinterpretation."[6]

The testimony by Harrison and Nosser also fails to raise a fact issue as to proximate causation.  Nosser's testimony speaks only to the generalized harm the Gillette Acquisition caused Zooth's business.  The same applies to Harrison's testimony, which is limited to descriptions of how P&G's takeover had devastating effects on Zooth's business and future growth because of P&G's lack of interest and support.

Accordingly, the testimony relied on by the Plaintiffs does not raise a genuine issue of material fact as to whether there was a causal link between the Defendants' alleged negligence and the Plaintiffs' alleged damages. On the other hand, the summary judgment record contains testimony from Grossman and

---

[6] Similarly speculative is Cleverly's testimony about whether Gillette had agreed to a best efforts clause and change in control clause in another, unrelated transaction in 2004. Cleverly stated that he had not seen the contract from the subject transaction – which is not a part of this record – since its closing in 2004, and that he is "not sure [Gillette] ever agreed to [a best efforts clause] in [the] Rembrandt [contract]."

No. 09-10225

from Gillette's outside counsel that Gillette rejected the best efforts and change in control clauses, and that the Defendants advised the Plaintiffs of the implications of the rejection and negotiated, or sought to negotiate, several alternative back-up provisions intended to protect the Plaintiffs' Earn-Out, including the minimum Earn-Out provision and employment agreements tied to the Earn-Out period.  Against this background, the Plaintiffs have failed to raise a triable issue of fact on an essential element of their case, *viz.*, whether their alleged damages were proximately caused by the Defendants' alleged malpractice.  Accordingly, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial," the Defendants are entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322-23 (citing *Anderson*, 477 U.S. at 250).

## IV.

The Plaintiffs also assert that they are entitled to recover the attorneys' fees paid to the Defendants because the Defendants breached their fiduciary duty to the Plaintiffs by "intentional[ly]" failing to disclose to them "the significance of the Gillette refusals" "so as to ensure easy payment of the outstanding fee owed them" because the Defendants' legal fees were to be paid out of the proceeds from the Zooth Transaction.

A breach of fiduciary duty claim is distinct from a legal malpractice claim and focuses on "whether an attorney obtained an improper benefit from representing a client." *Aiken v. Hancock*, 115 S.W.3d 26, 28 (Tex. App.-San Antonio 2003, pet. denied) (citing *Kimleco Petroleum, Inc. v. Morrison & Shelton*, 91 S.W.3d 921, 923 (Tex. App.-Fort Worth 2002, pet. denied)); *see also Liberty Mut. Ins.*, 82 F. App'x at 118 n.3 ("If a claim . . . involves a lawyer's performance in representing a client, then it is a legal malpractice claim.  If a claim involves a lawyer's 'integrity and fidelity,' then it is a breach of fiduciary duty claim." (citing *Goffney v. Rabson*, 56 S.W.3d 186, 190 (Tex. App.-Houston [14th Dist.]

9

No. 09-10225

2001, pet. denied); *Kimleco*, 91 S.W.3d at 923)).  Fee forfeiture is "not automatic" and is "restricted to 'clear and serious' violations of duty." *Burrow v. Arce*, 997 S.W.2d 229, 241 (Tex. 1999).  "Clear" means "'a reasonable lawyer, knowing the relevant facts and law reasonably accessible to the lawyer, would have known that the conduct was wrongful.'" *Id.* (quoting Restatement (Third) of the Law Governing Lawyers § 49 cmt. d (Proposed Final Draft No. 1, 1996)).  To determine an alleged violation's seriousness, one considers its gravity and timing; its willfulness; its effect on the value of the attorney's work; the client's harm, actual or threatened; and the public interest in maintaining the integrity of the attorney-client relationship. *Id.* at 141-44.  A claim for breach of fiduciary duty therefore "requires allegations of self-dealing, deception, or misrepresentations that go beyond the mere negligence allegations in a malpractice action." *McMahan v. Greenwood*, 108 S.W.3d 467, 495 (Tex. App.-Houston [14th Dist.] 2003, pet. denied) (citing *Goffney*, 56 S.W.3d at 193-94).

Although the Plaintiffs contend that they have "all along" sought forfeiture of Taft's fees, nothing in their complaint alludes to a breach of fiduciary duty or points to the kind of intentional, "clear and serious violations of duty" on the part of Taft that would justify such a remedy.  Instead, all of the Plaintiffs' allegations are couched in negligence.  Given that the Plaintiffs have failed to allege that Taft breached its fiduciary duty to the Plaintiffs or that the supposed breach was so "clear and serious" as to warrant forfeiture of the fees, the Plaintiffs' claim fails.

## V.

For the foregoing reasons, we AFFIRM the district court's judgment.