**AFFIRM; and Opinion Filed January 14, 2015.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-13-00892-CV

### DAVIS D. GILLIS, DAVE RICHARDSON, AND BARRY CLAUSS, Appellants
### V.
### PROVOST & UMPHREY LAW FIRM, LLP, AND JOE KENDALL, Appellees

**On Appeal from the 160th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-10-15198**

## OPINION

Before Justices Fillmore, Stoddart, and Whitehill[1]
Opinion by Justice Fillmore

This is an appeal from a summary judgment granted to the Provost & Umphrey Law Firm, LLP (Provost) and Joe Kendall, an attorney employed by Provost, in a lawsuit alleging a breach of fiduciary duty arising out of an attorney-client relationship. Appellants Davis Gillis, Dave Richardson, and Barry Clauss asserted in their live pleading that confidential information was provided by Gillis to Kendall in order to obtain legal advice concerning a possible lawsuit under the *qui tam* provisions of the federal False Claims Act (FCA)[2] relating to procurement of technology-related products and services by the Dallas Independent School District (DISD) and

---

[1] Justice FitzGerald, who was on the panel and participated in the submission of this case, retired December 31, 2014. Justice Whitehill succeeded Justice FitzGerald. Justice Whitehill has read the briefs and reviewed the record and now serves as a member of the panel.

[2] *See* 31 U.S.C.A. §§ 3729–3730 (2003) (under section 3730, a private person may bring a "qui tam" action—a civil action in the name of the United States of America for violation of the section 3729 prohibition of knowingly presenting a false or fraudulent claim for payment by the government). "[T]he [ FCA] *qui tam* provisions allow private plaintiffs ('relators') to sue on the government's behalf and receive a portion of the recovered funds if successful." *U.S. ex rel. LaCorte v. SmithKline Beecham Clinical Laboratories, Inc.*, 149 F.3d 227, 230 (3rd Cir. 1998); *see* 31 U.S.C.A. § 3730(d).

the Houston Independent School District (HISD). Appellants claimed the confidential information provided to Kendall was used by Provost and Kendall to prepare and file a *qui tam* lawsuit on behalf of clients Dan Cain and Pamela Tingley, resulting in a settlement concerning DISD procurement in which appellants could not share because they were not the first to file a claim. Provost and Kendall filed traditional and no-evidence motions for summary judgment arguing, among other things, that no confidences of appellants were disclosed or made the basis of the *qui tam* lawsuit filed on behalf of Cain and Tingley, no duty of loyalty was owed to appellants, no duty of loyalty or other fiduciary duty was breached, and appellants suffered no damages. The trial court granted summary judgment to Provost and Kendall without specifying the basis for its ruling and entered final judgment. In a single issue, appellants argue the trial court erred in granting summary judgment in favor of Provost and Kendall. We affirm the trial court's judgment.

## Background

*Appellants' Allegations[3]*

Gillis is a former agent of the Federal Bureau of Investigation (FBI). In 1991, he formed Dave Gillis & Associates (DGA), a private investigation firm. Richardson was a client who retained Gillis to investigate possible corruption and unlawful practices concerning procurement of technology-related products and services by DISD and HISD. Clauss was an employee of DISD who was "significantly involved in technology issues" and served as a then-confidential source to Gillis.

Based upon his investigation, Gillis sent an email message on December 2, 2004 to David A. Higbee, Chief of Staff and Deputy Assistant Attorney General, Antitrust Division, of

---

[3] The following factual allegations are taken from appellants' live pleading at the time of summary judgment. Although pleadings are not proof, they frame the issues for purposes of summary judgment. *See Ely v. Gen. Motors Corp.*, 927 S.W.2d 774, 782 (Tex. App.—Texarkana 1996, writ denied).

the United States Department of Justice that included "a general description of DISD e-rate technology corruption." After a month passed with no response from the Antitrust Division, Gillis decided to explore a claim under the *qui tam* provisions of the FCA "in an effort to obtain some kind of action relative to the corruption discovered." Gillis had previously performed investigative work for Kendall. Sammy Hughes, a retired criminal investigator for the Securities and Exchange Commission, and a current "representative" of DGA, had previously performed work for Kendall and Provost. In early 2005, Gillis met with Kendall for about one hour in the offices of Provost. Hughes accompanied Gillis to the meeting and it was "made known to Kendall that [Hughes] had consulted with Gillis in the confidential investigation." Kendall "knew" the purpose of the meeting was to "obtain attorney-client advice and counseling" regarding the possibility of filing a lawsuit under the *qui tam* provisions of the FCA on behalf of the United States of America for federal funds misspent as a result of wrongful conduct in procurement of technology-related products and services by DISD and HISD. "Both Gillis and Kendall knew" that only the first to file a *qui tam* lawsuit under the FCA had the opportunity to recover as a relator. During that meeting, Gillis provided Kendall confidential information uncovered during the investigation indicating, among other things, that third parties had colluded to violate competitive bidding requirements and restrict competition for DISD and HISD technology business, and had offered DISD employees unlawful consideration in exchange for DISD technology contracts.

Kendall gave no "definitive recommendation" during the meeting, but "indicated he would continue to give the matter some thought." Kendall did not make a "definitive commitment concerning continued representation" of appellants in an FCA lawsuit, but stated that he wanted "more time to consider what he had been told and review the materials Gillis provided," and indicated he would contact Gillis if he had further questions.

Kendall did not file an FCA lawsuit on behalf of appellants. Unbeknownst to appellants, Provost, Kendall, and co-counsel filed an FCA lawsuit in 2005 on behalf of Dan Cain and Pamela Tingley styled *US. ex rel. Cain v. Micro Systems Enterprises et al.,* No. 3-05CV1843-P, United States District Court for the Northern District of Texas (the *Cain* lawsuit). Pennsylvania attorney Brian P. Kenney (Kenney) retained Provost and Kendall to serve as co-counsel in connection with the *Cain* lawsuit. Appellants did not learn Provost was involved with the *Cain* lawsuit until "on or about" May 10, 2006. In the meantime, appellants retained counsel and filed their own *qui tam* lawsuit, styled *US. ex rel. Richardson v. Analytical Comp. Services et. al.,* Civ. No. H-05-3836, United States District Court for the Southern District of Texas (the *Richardson* lawsuit), on November 14, 2005. Both the *Cain* and *Richardson* lawsuits address alleged corruption regarding the procurement of technology-related products and services by DISD and unlawful gifts and other financial incentives made to DISD employees. As it related to DISD, the *Cain* lawsuit contained the same "material subject matter" Gillis, "on behalf of all [appellants]," discussed with Kendall. After appellants learned Provost was involved in the *Cain* lawsuit, they notified Provost by letter on May 12, 2006 of a purported conflict of interest, breach of fiduciary duty, and breach of the duty of loyalty. Appellees allegedly refused to take any action to remedy the "breach of duties."

In "approximately November of 2010," an agreement to settle the *Cain* and *Richardson* lawsuits was "consummated." Because the *Cain* lawsuit related to alleged corruption regarding the procurement of technology-related products and services by DISD, the relators who brought the lawsuit under the *qui tam* provisions of the FCA received a share of the settlement proceeds related to DISD procurement. Although the *Richardson* lawsuit related to alleged corruption regarding the procurement of technology-related products and services by both DISD and HISD, appellants, as the relators who brought the lawsuit under the *qui tam* provisions of the FCA, did

–4–

not receive any share of the settlement with regard to DISD procurement because they were not the first to file an FCA lawsuit concerning DISD procurement. The *Cain* and *Richardson* lawsuits "garnered a $16.25 million settlement from Hewlett-Packard [Company] (Hewlett-Packard) to the federal government;" of that amount, $1,424,969 was paid to the *Cain* lawsuit relators representing a share of the recovery relating to DISD procurement; and the *Richardson* lawsuit relators received $796,280 which related only to HISD procurement. Further, the federal government intervened in the *Cain* and *Richardson* lawsuits, "leaving the possibility that additional recoveries may be obtained."

Appellants alleged that as a result of the "initial attorney-client conference" between Gillis and Kendall, a "limited attorney-client relationship" was formed and Kendall had a duty to maintain the confidentiality of the information Gillis provided. Appellants also alleged that a "limited fiduciary duty" arose as a result of the "initial attorney-client consultation," and Kendall had a duty of loyalty that precluded participation "in actions that harmed Gillis's opportunity to file a successful false claim act lawsuit." Appellants alleged Kendall wantonly, recklessly, or willfully violated these duties. Further, appellants alleged that when they informed Kendall and Provost of "the breach of confidence and fiduciary duty of Kendall neither did anything to remedy or address the situation." Thus, appellants asserted the actions of both Kendall and Provost constitute a breach of the duty of loyalty and the duty of confidentiality. Appellants sought both actual and exemplary damages.[4]

*Appellees' Motions for Summary Judgment*

Provost and Kendall moved for a traditional summary judgment on the grounds that no confidential information of appellants was shared by Provost or Kendall with Kenney, no duty of

---

[4] Defendants Kendall Law Group, LLP and Brian P. Kenney filed motions for summary judgment that were granted by the trial court. After filing this appeal, appellants filed a motion to voluntarily dismiss those appellees, which was granted by this Court.

loyalty was owed by Provost or Kendall, and there was no breach of a duty of loyalty by Provost or Kendall. Provost and Kendall also filed a no-evidence motion for summary judgment on the grounds that there is no evidence of: a disclosure of confidential information or breach of a fiduciary duty to preserve appellants' confidential information; an attorney-client relationship with, or resulting duty owed to, Richardson or Clauss; or a duty of loyalty owed Gillis as a "prospective client" or breach of any fiduciary duty. Provost and Kendall also asserted there is no evidence of appellants' actual damages and no evidence of any action by them that would support an award of punitive damages.

*Summary Judgment Evidence*

In support of their traditional motion for summary judgment, Provost and Kendall relied on the affidavits of Kendall and Kenney. In his affidavit, Kendall stated that in 2002, he became employed by and opened the Dallas office of Provost. He knew Gillis and Hughes worked as private investigators on cases for Provost in 2004, 2005, and until late 2006, well after Gillis learned of the matters complained about in appellants' suit against Provost and Kendall. Kendall attested as follows:

> Sometime in late 2004 or early 2005, Gillis and Hughes met with me for approximately ten to fifteen minutes. Gillis told me that he had been hired as a private investigator for [HISD], that he wanted to become involved in *qui tam* cases and knew of some form of illegal activity in HISD that he had discovered in his capacity as a retained investigator for HISD. From the very start, the matter did not smell right to me, and I terminated the meeting with [Gillis] and [Hughes]. I was concerned at the time that [Gillis] was in effect trying to use information he had been paid to gather by HISD, and belonged to it and thereby subvert his own ethical duties to HISD while he was on the School District's payroll. In my opinion, he would not be an "original source whistleblower" of any alleged wrongdoing as required under the law as he described his investigative duties. He gave me no details about any "relators" but said he could provide our firm with "Whistleblower Plaintiffs" if there was some way he could be involved.

> Because [Gillis] and [Hughes] were actively working on cases for several different clients for [Provost], I never thought that the purpose of the meeting was to get personal legal advice for [Gillis] to hire the firm as his lawyers on a case for him. If I had believed that [Gillis] in fact was soliciting legal advice, I would not

–6–

have permitted [Hughes] to remain in the room. There was no expectation of confidentiality by anyone as a result of [Hughes]'s presence in the meeting. [Hughes] did not say one word during the meeting.

No documents were ever left or given to me for review, the matter was not calendared by me, there were never any follow-up telephone calls or correspondence by either me or [Gillis] or [Hughes], and no notes were taken by anyone. I have not seen or spoken to [Gillis] since that meeting. After that meeting, I never gave the matter another thought.

Subsequently, [Provost] received a call from [Kenney], an attorney from Pennsylvania. I did not speak with [Kenney]. [Kenney] had whistleblower clients and [Kenney] and his clients wanted to sue on fraud within [DISD]. [Kenney] had a prior relationship with [Provost], but did not have a Texas law license, and only wanted local counsel to file his Dallas-based *qui tam* lawsuit. Someone at [Provost], but not me, agreed for the firm to serve as local counsel and pleadings were drafted in Pennsylvania by Kenney that included my name along with the names of other lawyers. I served solely in the role of local counsel. I had no substantive involvement in the lawsuit. I never met or spoke with [Kenney] until years after the *Qui Tam* lawsuits were filed. I have never spoken to [Kenney]'s clients, the federal *qui tam* prosecutors involved in the lawsuits, the defense lawyers, or even Jim Reed (Reed), who was/is counsel for Gillis, Richardson and Clauss in the [*Richardson* lawsuit].

At no time did I share any information that [Gillis] had provided to me in that meeting to [sic] [Kenney] or [Kenney]'s clients, or anyone else. I didn't even recall the meeting, or know that it was an issue in the *qui tam* lawsuit, until 2008 or 2009.

At no time did I ever meet, speak to, or otherwise communicate with [Clauss] or [Richardson]. At no time did Gillis state that he was there in a representative capacity for Richardson or [Clauss]. Their names were never mentioned. The first time I heard of them was in 2008 or 2009.

My role was to serve as local counsel for Kenney's firm, which I did as a professional accommodation. There was never any agreement for me or [Provost], orally or in writing, to receive any money from the litigation. Indeed, though the case has settled, I have not been paid anything by [Kenney], his firm, or by anyone else for serving as "local counsel" in the Dallas *qui tam* action and do not expect to be paid.

In his affidavit, Kenney indicated his law firm specializes in whistleblower litigation

representing clients nationwide in *qui tam* matters under the FCA, and stated the following:

In or about September of 2005, [Cain] contacted my law firm in connection with a potential *qui tam* lawsuit. [Cain] retained our firm to represent him in connection with a *qui tam* lawsuit against [DISD] and other parties.

Myself and lawyers associated with my law firm did the substantive work in connection with preparing [Cain]'s *qui tam* Complaint for filing. Since neither I nor anyone in my office is licensed to practice in Texas, my firm used [Provost]'s Dallas Office to act as local counsel to file [Cain]'s lawsuit in Dallas [sic] Texas. At the time of the filing of [Cain]'s Complaint, neither I nor anyone in my firm had ever spoken to [Kendall] about [Cain]'s *qui tam* claim.

Karl Rupp (Rupp) was our contact person at [Provost] for purposes of filing the Cain *qui tam* Complaint. [Kendall] and [Rupp] provided no information of any sort to me or to anyone at or affiliated with my firm concerning any of the facts or allegations set out in [Cain]'s Complaint. No substantive changes were ever made to [Cain]'s Complaint based upon information provided by [Kendall] or [Rupp].

Neither [Kendall] nor anyone else at [Provost] ever provided to me or anyone at my firm any information based upon conversations that [Kendall] may have had with [Gillis] or [Hughes].

At some point during the course of the litigation, we became aware that [Reed] had filed a *qui tam* claim alleging fraud in [HISD] and [Reed] became aware of [Cain]'s *qui tam* lawsuit. In or about that time, [Reed] informed me that [Kendall] had previously spoken to his client. [Reed] initially did not provide the name of his client. At that time, I had never spoken to [Kendall] about [Cain]'s *qui tam* lawsuit and I had no knowledge of the existence of [Gillis] or that [Kendall] may have spoken to him.

In or about February of 2007, I informed [Rupp] of [Reed]'s statements to me and asked whether [Kendall] had ever met with [Reed]'s unnamed client to discuss allegations similar to those in [Cain]'s complaint. [Rupp] subsequently informed me that [Kendall] had no recollection of meeting with anyone to discuss allegations similar to those in [Cain]'s complaint.

It was only later when [Reed] identified his client by name that I learned the name of [Gillis]. Neither I nor anyone associated with my firm has ever learned of any information that [Gillis] or [Hughes] may have communicated to [Kendall]. No information that [Gillis] or [Hughes] may have communicated to [Kendall] has ever been used by me or my law firm to advance [Cain]'s *qui tam* case.

In response to the motions for summary judgment of Provost and Kendall, appellants filed the affidavit of Reed, lead attorney representing appellants in the *Richardson* lawsuit. Reed stated that on May 10, 2006, he first became aware that attorneys Brian McCafferty, Kenney, and Kendall were counsel of record for relators in the *Cain* lawsuit "that had substantially similar

allegations regarding technology products at Texas school districts," including DISD and HISD, and that the *Cain* lawsuit had been filed prior to the *Richardson* lawsuit. In his affidavit, Reed stated that in his discussions with Kenney, he became aware Kenney "had the most significant relationship (among the lawyers) with [the relators in the *Cain* lawsuit], . . . and that Kenney was the originator of the business that resulted in the filing of [the *Cain* lawsuit]." Kenney was the attorney of record on the *Cain* lawsuit, and he "represented to [Reed] that he had drafted and arranged for the [the *Cain* lawsuit] to be filed. . . ." Kenney told Reed he had retained Kendall to be his co-counsel on the *Cain* lawsuit.

Reed's affidavit further states that in November or December of 2010, a settlement agreement was entered into involving the relators in the *Cain* and *Richardson* lawsuits and Hewlett-Packard, a defendant named in those lawsuits. Reed indicates that attached to the affidavit "is a true and correct copy of that settlement agreement" and that Kenney is the only lawyer reflected in the settlement agreement as counsel for the relators in the *Cain* lawsuit. Reed stated that from at least May or June of 2006, Kenney was aware that appellants were alleging a conflict of interest and a breach of the duty of loyalty "that was damaging . . . Gillis and Richardson."[5]

Appellants filed an affidavit of Hughes in response to the motions for summary judgment of Provost and Kendall. In his affidavit, Hughes stated he began working as a private investigator for Gillis in March 2002 and was engaged in that capacity at the time of executing his affidavit. Hughes stated that prior to early 2005, he had been "privy to some of the confidential information regarding the unlawful conduct at both [HISD] and [DISD]." By

---

[5] In his affidavit, Reed stated that affidavits of Gillis and Richardson are attached to his affidavit. However, the record contains no affidavit of Richardson, and the affidavits appellants state they rely upon in their response to Provost and Kendall's traditional and no-evidence motions for summary judgment are affidavits of Reed, Gillis, and Hughes.

example, Hughes stated Gillis would discuss with him efforts to "get federal law enforcement to take action on one or more of the matters." Hughes further attested:

> In approximately January or February of 2005 I went to a meeting with [Gillis] at the Dallas office of [Provost]. We met in a conference room for at least an hour and maybe closer to one and one-half hours.

> Prior to the 2005 meeting, I had performed private investigative work at the request of [Provost]. I had worked on approximately four or five matters for [Provost] and on all occasions kept the information and investigation confidential and privileged.

> I did some work in 2003, 2004, and 2006 for [Provost]. I have never received any complaint from [Provost] that I failed to honor, and maintain, the confidentiality and privilege as to any data or communication I received.

> Prior to early 2005 I had met and spoken with [Kendall] on numerous occasions. I knew Mr. Kendall.

> During the meeting in early 2005 I recall a discussion about numerous areas of public corruption and fraud in both DISD and HISD. I remember that a summary of these areas was contained in the memorandum [Gillis] had drafted to [Higbee] dated December 2, 2004. Prior to that meeting I had, from time to time, discussed several of these areas with [Gillis]. I knew from my training, employment history, and my work for [Gillis] that all of this information, including the meeting with [Kendall], was confidential. In my opinion, [Kendall] knew I was capable of and fully experienced in maintaining confidential and privileged information.

> I do not remember all of the discussion in the early 2005 [sic] with [Kendall]. I do remember the discussion related to fraud and/or unlawful activities at both HISD and DISD. I do remember [Gillis] was seeking a legal opinion and/or advice from [Kendall] related to this activity.

> I do remember that Robby Collins at DISD was mentioned as well as Rod Paige at HISD. I remember former FBI agent Danny Defenbaugh being discussed.

> Although most of the discussion was between [Gillis] and [Kendall], I do remember talking to [Kendall] about former Dallas City Councilman Al Lipscomb. . . .

> I have never disclosed any of the discussions at that meeting with [Kendall] in early 2005 other than with [Gillis] or related to this lawsuit.

–10–

Another affidavit of Hughes was attached to Reed's affidavit. In that affidavit, Hughes stated that he and his "associate," Gillis, met with Kendall in Provost's conference room and "Gillis discussed with [Kendall] his extensive investigation of corruption in Texas School Districts, primarily Dallas and Houston." Hughes stated that Gillis discussed much of the substantive information contained in the December 2, 2004 memorandum from Gillis to Higbee.

Two affidavits executed by Gillis were submitted as appellants' summary judgment evidence. In his August 8, 2008 affidavit, Gillis stated he started DGA, an investigation firm, in 1991, and Hughes has been an investigator for DGA since approximately 2002. Gillis attested that he has been "investigating corruption in public schools," including DISD and HISD, since 1998. According to Gillis, "[m]ost of these investigations were completed when clients hired [DGA] and some by me independently when information and witnesses were presented." According to Gillis, after consulting with federal law enforcement officials, he sent an e-mail on December 2, 2004 to Higbee, "Chief of Staff and Deputy Assistant [sic] General, Antitrust Division." A month passed without a response from the Antitrust Division, and Gillis decided to "explore" an FCA lawsuit "relative to the corruption discovered." Gillis had performed investigative work for Kendall, and Hughes, "as a representative of [DGA]," had performed work for Kendall and Provost. Gillis stated that between December 2, 2004 and April or May 2005, he met with Kendall at Provost's office.[6] Gillis was accompanied by Hughes. Gillis attested that:

> Both [Hughes] and [Kendall] knew that the purpose of the meeting was to obtain attorney-client advice and counseling regarding the possibility of becoming a Relator in [an FCA] lawsuit. During this meeting I shared confidential communications which would have included the general subject matter of the issues discussed in [the December 2, 2004 e-mail to Higbee and the e-mails

[6] In a later affidavit, Gillis stated he reviewed a January 6, 2005 memorandum concerning *qui tam* actions from Wilbur Gregory, Chief Division Counsel of the FBI, prior to his meeting with Kendall. Gillis also stated he knows a March 10, 2005 memorandum to attorney John Bryant, with whom he met "for essentially the same reason" he met with Kendall, was not in existence when he met with Kendall. Therefore, according to the summary judgment evidence, the meeting between Gillis and Kendall took place between January 1, 2005 and March 10, 2005.

–11–

between "Joe Dallas" and Gillis] and the subjects set forth in paragraphs 55, 63–69, and 76 of the Original Complaint filed [in the *Richardson* lawsuit].[7] I also told [Kendall] about a then confidential source, [Clauss], that was an employee at DISD who was significantly involved in technology issues, and issues related to the defendants in the [FCA] lawsuits. I told [Kendall] that [Clauss] had information which I considered significant and he was in contact with me on a confidential basis.

The meeting lasted approximately one hour. No definitive recommendation was given by [Kendall] during the meeting and he indicated he would continue to give the matter some thought. [Kendall] never made a definitive commitment concerning continued representation in [an FCA] lawsuit.

---

[7] Those paragraphs of the *Richardson* lawsuit Original Complaint contain the following allegations:

55. Whatever the name utilized for the point of contact, the Consortium is an association in fact and in law formed by the Defendants for the agreed and joint purpose of providing goods and services to at least HISD and DISD. Defendants intentionally formed and entered into this association, and expressly agreed to the relationship. Defendants evidenced their Consortium relationship in one or more express agreements.

\* \* \*

63. In approximately December 2002, DISD issued five [Requests for Proposals] (RFPs) for technology to be provided to DISD, namely (1) Network Electronics; (2) Email System; (3) Network Servers; (4) Network Cabling; and (5) Web Access-Portal[.] The pre-proposal conference for these RFPs was scheduled for December 27, 2002. These RFPs were issued after the DISD school board cancelled an IBM contract for providing many of the goods and services being requested by the RFPs, at the behest of Mr. Bohuchot. He, as Chief Technology Officer, had significant influence over DISD technology purchases.

64. These five RFPs were seeking goods and services worth tens of millions of dollars. Despite the substantive nature of the project, the RFPs were glaringly deficient in detail and specifications. The RFPs did not include the specifications for work, services and materials that were being purchased[.] Some of the specifications were not even developed until after the RFPs went out leading, for example, to five revisions of the Network Cabling RFP specifications including some revisions that were made after the Consortium had already won the bid.

65. As a matter of prudent competitive RFP process, great care should have been exercised in constructing the RFPs and in evaluating the responses to the RFPs. This is especially true when the RFP process seeks the purchase of tens of millions of dollars of a wide range of complex technology products[.] With vague and general RFPs, only an insider can appropriately respond and address DISD's real undisclosed needs.

66. These RFPs resulted in four proposals (IBM, SBC, True Technology Solutions, and the Consortium) that were due January 7, 2003[.] Reasonable practice would have dictated that several weeks would be needed to analyze the responses to the RFPs (including a question and answer process with all the proposers). Incredibly, Mr. Bohuchot dictated that the decision for the purchase of tens of millions of technology goods and services had to be made in twenty-four (24) hours of receipt of the four responses[.]

67. In hindsight, the urgent need and Mr. Bohuchot's maneuvers should have raised more red flags. Mr. Bohuchot successfully lobbied in favor of the Consortium[.] He made the RFP review committee (with Mr. Boggs helping him out) focus primarily on price without outlining the differences between the products being offered. It would have been impossible to have made a thorough, thoughtful, and prudent evaluation of the responses and reach a decision on the recommended proposal in twenty-four (24) hours. [Universal Service Administration Company]'s [Schools and Libraries Division] would have allowed DISD to notify them of the winning bid as late as early February 2003.

68. On information and belief, Defendants, through one or more of their agents/representatives of the Consortium, improperly influenced Mr. Bohuchot and other members who were intimately involved in the decision-making process. On information and belief, Mr. Buhochot, and other people (including school board trustees with influence over the decisions of DISD), were influenced with and by financial rewards. Those financial incentives included fishing trips, an interest in or use of a yacht, meals, travel, golf clubs, and, upon information and belief, payments that, directly or indirectly, were made for the benefit of those involved in asserting the interests of the Consortium.

69. As reported in *The Dallas Morning News*, Mr. Bohuchot has for years accepted the free, regular use of sport-fishing yachts owned by MSE–a top provider of computer hardware to DISD. In addition to use of the 59-foot vessel, Mr. Bohuchot was given the privilege of christening the yacht with its name–Sir Veza II.

\* \* \*

76. Despite Mr. Bohuchot's initial comments to the press that he did not control the selection of the Consortium, he did negotiate the final contract once a deal was reached in principal. Documents later revealed that when the board met to authorize the contract to be negotiated in January 2003, Mr. Bohuchot actually vouched in writing for the deal. He certified to the board that the consortium provided the best value and met required specifications, and that "no conflicts of interest" existed with the deal.

–12–

> I had no further conversations with [Kendall] after that meeting regarding the subjects discussed herein.

Gillis stated that in April or May of 2005, he met with "four government representatives" relating to "DISD and HISD corruption issues, including e-rate technology issues," and shortly thereafter, Richardson met with those government representatives.

Appellants relied on a March 7, 2013 affidavit of Gillis in response to the traditional and no-evidence motions for summary judgment of Provost and Kendall. In that affidavit, Gillis stated that he never told Kendall he was hired as a private investigator for HISD or retained by HISD in any capacity. He stated that he may have told Kendall that from approximately the summer of 1997 to the summer of 1998, he worked as a private investigator for the DISD Board of Trustees, but none of the matters he worked on for DISD had anything to do with the matters he disclosed to Kendall.

Gillis stated that the meeting with Kendall at the office of Provost "lasted at least an hour and probably closer to one and one-half hours," and the reason he scheduled the meeting with Kendall was "to get his legal advice and to determine if [Provost] might be interested in representing me, and the others involved depending on the area, related to unlawful activities at HISD and DISD." Gillis stated that he told Kendall that, in an effort to "get some branch of the U.S. Government to take action" with regard to public corruption at HISD and DISD, he had met with and provided documents to federal government officials. Gillis stated that he "identified that federal funds were being misspent as a result of Mr. Buhuchot improperly favoring a 'Consortium' group of companies," including Hewlett-Packard. Gillis "identified various problems with the process of choosing the technology vendors, including expensive entertainment provided" and "specifically told [Kendall] I had a source with the DISD technology department." Gillis stated he "provided documents to support these disclosures."

Gillis attested that he gave Kendall "substantially the same group of documents" he later gave to John Bryant, another attorney he consulted concerning possible *qui tam* claims.

Gillis took Hughes to the meeting with Kendall because Hughes knew Kendall and had done private investigation work for Provost. According to Gillis, he knew that throughout Hughes's professional career "he was aware of the need to protect privileged and confidential communication and to my knowledge had always protected such privileged and confidential communications." Prior to the meeting with Kendall, Hughes "had been privy to confidential communications related to the HISD and DISD matters that were the subject of the meeting." Gillis stated that he told Kendall and Hughes that in the event Kendall wanted more investigation as to these matters, Gillis might use Hughes for the investigation. Gillis attested that Kendall knew "I was seeking his legal advice as to potential *qui tam* claims and he did not advise me that [Hughes] would need to leave or that any problem was created by having present one of the private investigators under my license." Gillis attested:

> I made it clear to [Kendall] that I believed there were several areas of fraudulent activity and public corruption related to both DISD and HISD. I made it clear to [Kendall] that, prior to our meeting, I had made several efforts to get federal law enforcement officials to take definitive action. I told [Kendall] I was interested in obtaining his opinion as to bringing one or more *qui tam* cases in the areas I described [sic] him. I was interested in determining whether [Kendall] and [Provost] would represent me in one or more of these cases. I also made it clear to [Kendall] that, depending on which area of fraudulent activity he was interested in, there would be other persons joined as claimants/relators.

Gillis attested that after meeting with Kendall, he met with Bryant "for essentially the same reason" he met with Kendall, because he was interested in "obtaining attorney-client advice concerning a possible *qui tam(s)* related to fraud/corruption at both HISD and DISD in several different areas." Gillis stated he later gave Bryant a packet of documents, including a March 10, 2005 memorandum from Gillis to Bryant that Gillis stated he knew was not in existence at the time he met with Kendall.

–14–

Gillis stated that on May 10, 2006, he became aware Reed met with attorney Brian McCafferty of the Philadelphia office of Provost and that Provost was one of the law firms representing *qui tam* relators who filed the *Cain* lawsuit in September of 2005 related to "fraudulent technology purchases at DISD."

*Summary Judgment in Favor of Appellees*

The trial court granted summary judgment to Provost and Kendall without stating the bases for its ruling and entered final judgment. Appellants' motion for new trial was overruled by operation of law, and they filed this appeal of the trial court's order granting summary judgment.

**Summary Judgment**

Appellants contend the trial court erred in granting summary judgment in favor of Provost and Kendall because appellants presented evidence that: Gillis, on behalf of himself, Richardson, and Clauss, disclosed confidential information to Kendall in an effort to obtain a legal opinion from Kendall during a meeting at Provost's office and this information "substantiated" the *Cain* lawsuit, resulting in a $16.25 million settlement; and Kendall's decision to file the *Cain* lawsuit based on the *qui tam* provisions of the FCA barred appellants from filing a similar suit and recovering a monetary award. Appellants assert they carried their burden of proof that, as a matter of law, Provost and Kendall breached their fiduciary duty to "their clients" Gillis, Clauss, and Richardson, and appellants are entitled to recover exemplary damages.

*Summary Judgment Standards of Review*

The standards of review for traditional and no-evidence summary judgment are well known. *See Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548 (Tex. 1985). With respect to a traditional motion for summary judgment, the movant has the burden to demonstrate that no genuine issue of material fact exists

–15–

and judgment should be rendered as a matter of law. TEX. R. CIV. P.166a(c); *Nixon*, 690 S.W.2d at 548–49. We review a no-evidence summary judgment under the same legal sufficiency standard used to review a directed verdict. TEX. R. CIV. P. 166a(i); *Gish*, 286 S.W.3d at 310. To defeat a no-evidence summary judgment, the nonmovant is required to produce evidence that raises a genuine issue of material fact on each challenged element of its claim. *Gish*, 286 S.W.3d at 310; *see also* TEX. R. CIV. P. 166a(i) .

In reviewing both a traditional and no-evidence summary judgment, we consider the evidence in the light most favorable to the nonmovant. *Smith v. O'Donnell*, 288 S.W.3d 417, 424 (Tex. 2009); *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008). We credit evidence favorable to the nonmovant if a reasonable fact-finder could, and we disregard evidence contrary to the nonmovant unless a reasonable fact-finder could not. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009); *Gish*, 286 S.W.3d at 310. If the trial court's order does not state the grounds on which summary judgment was granted, we will affirm if any of the theories advanced by the summary judgment movant are meritorious. *State Farm Cas. Co. v. S.S.*, 858 S.W.2d 374, 380 (Tex. 1993). When a party has moved for summary judgment on both traditional and no-evidence grounds, we typically first review the propriety of the summary judgment under the no-evidence standard. *See* TEX. R. CIV. P. 166a(i); *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004); *Rico v. L-3 Commc'ns Corp.*, 420 S.W.3d 431, 438–39 (Tex. App.—Dallas 2014, no pet.).

*Breach of Fiduciary Duty*

Appellants contend the trial court erred in granting summary judgment in favor of appellees because summary judgment proof establishes the existence of a fact issue regarding appellees' breach of the fiduciary duties of loyalty and confidentiality owed to appellants.

–16–

<u>Breach of the Duty of Loyalty</u>

Appellees moved for traditional summary judgment on the grounds that, as a matter of law, no duty of loyalty was owed to appellants or breached. Appellees moved for a no-evidence summary judgment arguing there is no evidence of a duty of loyalty owed to appellants or a breach. In their no-evidence motion for summary judgment, appellees argued Gillis was only a "prospective" client of Provost and Kendall, there is no continuing duty of loyalty owed to prospective clients that a lawyer never represents, and the duty of loyalty is owed only to actual clients and, even then, the duty is owed only during the course of the representation and terminates with the conclusion of the attorney-client relationship. In response, appellants argue that an attorney-client relationship can be created with respect to communications between attorneys and "prospective clients" during an initial consultation, provided actual confidential information was disclosed. Appellants claim that is the case here: Gillis, during an initial consultation with Kendall, exchanged with Kendall confidential information creating an attorney-client relationship with attendant fiduciary responsibilities, including a duty of loyalty. Appellants do not contend an attorney-client relationship with Provost or Kendall was created by express contract.

Fiduciary duties arise when an attorney-client relationship is created. *Meyer v. Cathey*, 167 S.W.3d 327, 330 (Tex. 2005). The elements of a breach of fiduciary duty claim are: (1) a fiduciary relationship must exist between the plaintiff and defendant; (2) the defendant must have breached his fiduciary duty to the plaintiff; and (3) the defendant's breach must result in injury to the plaintiff or benefit to the defendant. *Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App.—Dallas 2006, pet. denied); *see also Gregory v. Porter & Hedges, LLP*, 398 S.W.3d 881, 885 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (attorney who breaches fiduciary duty to a client has not provided the bargained-for loyalty on which right to compensation is based).

–17–

In order to recover on a theory that an attorney has breached a fiduciary duty of loyalty, the plaintiff must establish that an attorney-client relationship existed. *See Blume*, 196 S.W.3d at 447; *see also Murphy v. Gruber*, 241 S.W.3d 689, 693 (Tex. App.—Dallas 2007, pet. denied) (attorney breaches fiduciary duty when benefitting improperly from the attorney-client relationship by, among other things, subordinating his client's interest to his own, retaining the client's funds, engaging in self-dealing, improperly using client confidences, failing to disclose conflicts of interest, or making misrepresentations to achieve those ends).

The attorney-client relationship is a contractual relationship whereby an attorney agrees to render professional services for a client. *Bright v. Addison*, 171 S.W.3d 588, 596 (Tex. App.—Dallas 2005, pets. denied). The attorney-client relationship "arises from the clear and express agreement of the parties about the nature of the work to be done and the compensation to be paid." *Hill v. Bartlette*, 181 S.W.3d 541, 547 (Tex. App.—Texarkana 2005, no pet.). The relationship may be expressly created through a contract or it may be implied from the actions of the parties. *Addison*, 171 S.W.3d at 596. However, it is necessary that the parties either explicitly or implicitly manifest an intention to create an attorney-client relationship. *Parker v. Carnahan*, 772 S.W.2d 151, 156 (Tex. App.—Texarkana 1989, writ denied).[8] The determination of whether there was a meeting of the minds must be based on an objective standard examining what the parties did and said and not on their alleged subjective states of mind. *Addison*, 171 S.W.3d at 596; *Roberts v. Healey*, 991 S.W.2d 873, 880 (Tex. App.—Houston [14th Dist.] 1999, pet. denied).

Gillis acknowledged in his affidavit that he had performed investigative work for Provost and that Hughes had performed investigative work for both Provost and Kendall. Gillis

---

[8] *See also Scientific Leasing, Inc. v. Windle*, No. 05-92-00469-CV, 1993 WL 25336, at *4 (Tex. App.—Dallas Feb. 4, 1993, no writ) (not designated for publication) (both parties must explicitly or by their conduct manifest intention to create attorney-client relationship).

indicated that because he had not received a response to his concerns from federal officials, he decided to "explore" an FCA lawsuit. According to Gillis, Kendall "knew that the purpose of the meeting was to obtain attorney-client advice and counseling regarding the possibility of becoming a Relator in [an FCA] lawsuit." Gillis stated that the reason he scheduled the meeting with Kendall was to get his legal advice and determine whether Provost and Kendall would represent him in one or more FCA lawsuits. Gillis attested that he told Kendall he was interested in obtaining Kendall's opinion as to bringing one or more *qui tam* cases. Gillis also attested that he provided documents to Kendall at the meeting. Gillis told Kendall that in the event Kendall wanted more investigation performed, Gillis might use Hughes for the investigation. Gillis stated that "[n]o definitive recommendation was given by [Kendall] during the meeting and he indicated he would continue to give the matter some thought," and that Kendall "never made a definitive commitment concerning continued representation in [an FCA] lawsuit."

The law requires that in order for an attorney-client relationship to exist, the parties, explicitly or by their conduct, must manifest an intention to create that relationship. *See Carnahan*, 772 S.W.2d at 156. We review the summary judgment evidence of what the parties said and did in the light most favorable to the nonmovant appellants to determine whether appellees conclusively negated the existence of an implied attorney-client relationship, that is, whether appellees have shown there is no evidence the parties manifested an intent to create an attorney-client relationship. *See Addison*, 171 S.W.3d at 596; *Roberts*, 991 S.W.2d at 880; *Carnahan*, 772 S.W.2d at 156.

There is no evidence of an intention on Kendall's part to undertake legal representation of Gillis or evidence that Kendall reasonably induced a belief by Gillis that he had agreed to represent him. The summary judgment evidence, in the light most favorable to the nonmovant appellants, establishes Gillis met with Kendall regarding the "possibility" of Gillis becoming a

relator in an FCA lawsuit and to determine if Provost and Kendall "might be interested in representing" or "would represent" Gillis in a potential FCA lawsuit or lawsuits. There is no evidence of a commitment or undertaking by Kendall to represent Gillis, and in fact, Gillis stated that Kendall made no commitment regarding "continued" representation of appellants. There is no evidence of a discussion or agreement between Kendall and Gills regarding attorney's fees or compensation or regarding the nature of the work Kendall would perform for Gillis. *See Kiger v. Balestri*, 376 S.W.3d 287, 291 (Tex. App.—Dallas 2012, pet. denied) (parties should clearly and expressly agree to nature of work to be done and compensation to be paid). There is no evidence Gillis ever authorized Kendall to take any specific legal action on his behalf. Although Gillis stated he met with Kendall to obtain "attorney-client advice,"[9] appellants point to no evidence that Gillis and Kendall mutually intended to form an attorney-client relationship. *See id.* (whether agreement is express or implied, there must be evidence *both* parties intended to create attorney-client relationship; one party's subjective believe is insufficient to raise question of fact to defeat summary judgment); *Addison*, 171 S.W.3d at 596; *Roberts*, 991 S.W.2d at 880; *Carnahan*, 772 S.W.2d at 156; *see also Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 164 (Tex. 2004) (speculation is not evidence of an attorney-client relationship). Further, Gillis stated that within three months after meeting with Kendall, he met with attorney Bryant "for essentially the same reason" he met with Kendall, because he was interested in "obtaining attorney-client advice concerning a possible" FCA lawsuit or lawsuits, further undermining any assertion that Gillis believed there was an ongoing attorney-client relationship with Provost or Kendall.

---

[9] In his affidavit, Kendall stated his opinion that Gillis "would not be an 'original source whistleblower' of any alleged wrongdoing as required to present a *qui tam* claim under the FCA. Appellants argue on appeal that this statement raises a fact issue as to whether Kendall offered legal advice during his meeting with Gillis. However, Kendall's opinion was stated in his affidavit; there is no evidence of any legal advice given by Kendall to Gillis at their meeting or thereafter, and there is no evidence of any legal services performed for appellants as follow-up to the meeting by Kendall or any other Provost attorney.

There is no evidence in the record raising a genuine issue of material fact about whether Gillis and Kendall mutually intended to form an attorney-client relationship. There being no evidence of the formation of an attorney-client relationship, and thus a fiduciary duty of loyalty owed to Gillis by Provost or Kendall, we conclude the trial court did not err by granting a no-evidence summary judgment in favor of Provost and Kendall on Gillis's breach of a duty of loyalty claim. *See Swank v. Cunningham*, 258 S.W.3d 647, 666 (Tex. App.—Eastland 2008, pet. denied) (in absence of attorney-client relationship, there could be no recovery on a breach of fiduciary duty claim against attorneys).

Appellants contend that when Gillis met with Kendall he did so on behalf of himself, Richardson and Clauss, and that Gillis shared confidential information with Kendall that had been developed by all three appellants. To the extent this contention is made in support of an argument that Richardson and Clauss were also prospective clients of Provost and Kendall as a result of an initial consultation between Gillis and Kendall, resulting in a fiduciary duty of loyalty owed by Provost and Kendall to Richardson and Clauss, we disagree. Neither Richardson nor Clauss filed an affidavit in the trial court in response to appellees' motions for summary judgment. The affidavits of Gillis contain no testimony that Gillis was authorized to meet with Kendall in any representative capacity for Richardson or Clauss, that Gillis informed Kendall that Richardson or Clauss were prospective clients, or that Kendall received any confidential information from Richardson or Clauss. There being no evidence of the existence of a fiduciary duty of loyalty owed by Provost or Kendall to Gillis, in an individual or representative capacity, or to Richardson or Clauss directly, we conclude the trial court did not err by granting a no-evidence summary judgment in favor of Provost and Kendall on the breach of duty of loyalty claims of Richardson and Clauss. *See id.*

–21–

Having concluded the trial court did not err by granting a no-evidence summary judgment in favor of Provost and Kendall on appellants' claim that Provost and Kendall breached the fiduciary duty of loyalty, we need not address the merits of appellees' traditional motion for summary judgment on this ground. *See Ridgway*, 135 S.W.3d at 600.

<u>Breach of the Duty of Confidentiality</u>

We next turn to whether the trial court properly granted appellees' traditional motion for summary judgment on Gillis's claim they breached the fiduciary duty of confidentiality.[10] We conclude appellees' evidence in support of the traditional motion for summary judgment conclusively established there was not such a breach. Therefore, as set out below, we conclude the trial court did not err by granting appellees' traditional motion for summary judgment on Gillis's claim of breach of the duty of confidentiality.

Appellants allege Gillis conveyed confidential information to Kendall in their meeting and that Kendall improperly used the confidential information Gillis provided in filing the *Cain* lawsuit. Provost and Kendall filed a traditional motion for summary judgment claiming appellants could not prevail, as a matter of law, on the claim their confidential information was disclosed by Kendall to Kenney in connection with the *Cain* lawsuit because appellants improperly rely on a legal presumption of disclosure that applies only in the context of attorney disqualification, and actual proof of disclosure is required to sustain appellants' claim.

"An attorney who uses a client's confidential information for his own interest and against the client's interest to the client's detriment may be liable for breach of fiduciary duty." *Kennedy v. Gulf Coast Cancer & Diagnostic Ctr. at Se., Inc.*, 326 S.W.3d 352, 360 (Tex. App.— Houston [1st Dist.] 2010, no pet.); *see also Gruber*, 241 S.W.3d at 693. As discussed above, we have concluded the trial court did not err in granting summary judgment in favor of Provost and

---

[10] We recognize that generally we address a no-evidence summary judgment before addressing a traditional summary judgment.

Kendall on appellants' claim of breach of the duty of loyalty, because there is no evidence an attorney-client relationship existed between Kendall and appellants. With regard to the duty of confidentiality, however, we are presented with the argument that the duty is owed not only to clients but to prospective clients that have consulted the attorney with the intent to obtain professional advice. In their appellate brief, appellees acknowledge that "Kendall owed Gillis only the duty not to disclose his confidential information" and that "[a]ppellants rightly note that an attorney's duty not to disclose confidential information extends both to clients and prospective clients, and essentially is eternal." *See* TEX. R. EVID. 503(a)(5) ("A communication is 'confidential' if not intended to be disclosed to third persons other than those to whom disclosure is made in furtherance of the rendition of professional legal services to the client . . . .").[11] Although acknowledging Kendall "had a continuing duty of confidentiality," appellees argue that Kendall never breached that duty of confidentiality and that the trial court correctly granted summary judgment in favor of appellees for that reason.

In Texas, a claim of disclosure of confidential information requires evidence of actual disclosure. *See Brown v. Green*, 302 S.W.3d 1, 8–9 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (to show breach of fiduciary duty based on inappropriate use or disclosure of confidential information, client was required to produce evidence of actual misuse or disclosure); *Capital City Church of Christ v. Novak*, No. 03-04-00750-CV, 2007 WL 1501095, at *4 (Tex. App.— Austin May 23, 2007, no pet.) (mem. op.) (in attorney disqualification context, presumption arises from a "substantial relationship" between prior and subsequent representations that

---

[11] An attorney's relationship with clients and former clients is a subject of the Texas Disciplinary Rules of Professional Conduct. *See* TEX. DISCIPLINARY R. PROF'L CONDUCT, *reprinted in* TEX. GOV'T CODE ANN. Title 2, Subtitle G, App., Art. X § 9 (West 2013). Courts sometimes look to those rules to determine whether an attorney should be disqualified from representing a new client against a former client, and those disciplinary rules have been cited as authority for restrictions on an attorney's ability to represent new clients in suits involving former clients. *See, e.g.*, *Henderson v. Floyd*, 891 S.W.2d 252, 253 (Tex. 1995) (orig. proceeding); *Wasserman v. Black*, 910 S.W.2d 564, 572 & n.4 (Tex. App.—Waco 1995, no writ) (orig. proceeding). However, violation of those rules "does not give rise to a private cause of action nor does it create any presumption that a legal duty to a client has been breached." *See* TEX. DISCIPLINARY R. PROF'L CONDUCT, Title 2, Subtitle G, App. Art. X § 9, preamble ¶ 15); *Blankinship v. Brown*, 399 S.W.3d 303, 311 (Tex. App.—Dallas 2013, pet. denied) Therefore, we look elsewhere for authority regarding the duty owed by an attorney to a prospective client with respect to non-disclosure of confidential information.

confidences were disclosed to former attorney; however, that presumption cannot substitute for traditional requirement that plaintiff support a breach-of-fiduciary duty claim with evidence of disclosure); *see also City of Garland v. Booth*, 895 S.W.2d 766, 772–73 (Tex. App.—Dallas 1995, writ denied).

On this record, there is no evidence of an actual disclosure by Kendall of confidential information Gillis allegedly provided to him in their meeting. In his affidavit, Kendall stated that after his meeting with Gillis, Provost received a call from Kenney, who represented clients desiring to file an FCA lawsuit in Dallas alleging "fraud within [DISD]." Kenney, who was not licensed to practice law in Texas, had a prior relationship with Provost and wanted local counsel for the plaintiffs in the FCA lawsuit. Someone at Provost other than Kendall agreed that Provost would serve as local counsel. The pleadings in the *Cain* lawsuit were drafted in Pennsylvania by Kenney. Kendall, "as a professional accommodation," served only as local counsel for the *Cain* lawsuit plaintiffs and had no substantive involvement in the lawsuit. Kendall stated that he never shared any information Gillis provided to him in their meeting with anyone else, and specifically not with Kenney or Kenney's clients in the *Cain* lawsuit.

Kenney's affidavit is consistent with Kendall's affidavit. In his affidavit, Kenney attests that he and lawyers associated with his firm performed the substantive work in connection with preparing the complaint in the *Cain* lawsuit. Since neither Kenney nor anyone in his office was licensed to practice law in Texas, Kenney used Provost as local counsel to file the *Cain* lawsuit in Dallas. Kenney indicated in this affidavit that at the time of filing of the *Cain* lawsuit, neither Kenney nor anyone else in his firm had ever spoken with Kendall about the *Cain* lawsuit *qui tam* claims. Kenney's contact at Provost for purposes of filing the *Cain* lawsuit was Rupp. Kenney attested that neither Kendall nor Rupp provided information "of any sort" to Kenney or his firm concerning any of the facts or allegations set out in the *Cain* lawsuit complaint. Further Kenney

indicated that no substantive changes were ever made to the *Cain* lawsuit complaint based on information provided by Kendall or Rupp. Finally, Kenney stated that neither Kendall nor anyone else at the Provost firm ever provided to him or anyone at his firm any information based upon conversations that Kendall may have had with Gillis or Hughes.

Reed's affidavit does not conflict with the affidavits of Kendall or Kenney. Reed stated in his affidavit that in May 2006, he became aware that attorneys Brian McCafferty, Kenney, and Kendall were counsel of record on behalf of the relators in the *Cain* lawsuit "that had substantially similar allegations regarding technology products at Texas school districts," including DISD and HISD, to the *Richardson* lawsuit and that the *Cain* lawsuit had been filed prior to the *Richardson* lawsuit. In his affidavit, Reed stated that in his discussions with Kenney, he became aware that, among the lawyers representing the relators in the *Cain* lawsuit, Kenney "had the most significant relationship" with the relators and that Kenney was the originator of the business that resulted in the filing of the *Cain* lawsuit. Kenney represented to Reed that he had drafted and arranged for the *Cain* lawsuit to be filed and had retained Kendall as his co-counsel.

Appellants rely on Gillis's statement in his affidavit that he gave confidential information to Kendall, coupled with the allegations asserted in the *Cain* lawsuit, to raise an issue of fact about whether Kendall breached the duty of confidentiality. Taking as true the allegation that Gillis provided information to Kendall in confidence relating to his "investigation" of procurement of technology-related products and services by DISD, there is no evidence, only conjecture, that Kendall used the information in connection with filing the *Cain* lawsuit. None of the affidavit testimony in this case provides proof that Provost or Kendall shared with Kenney, or anyone at Kenney's law firm, any confidential information provided by Gillis to Kendall at the meeting in Provost's office. Even though the summary judgment evidence is uncontroverted

that Kenney prepared the complaint in the *Cain* lawsuit without input from Provost or Kendall and based solely on information provided by the *Cain* lawsuit relators, appellants rely on the "facts" the complaint in the *Cain* lawsuit alleges the same misconduct as the *Richardson* lawsuit, the *Cain* lawsuit involves the same "material subject matter" Gillis allegedly discussed with Kendall, and Kendall's signature on the *Cain* lawsuit complaint, as evidence of a disclosure of confidential information Gillis provided to Kendall. However, the pleadings in the *Cain* lawsuit are not proof of disclosure. *See Green*, 302 S.W.3d at 12 (pleading in litigation which plaintiff contended demonstrated breach of the duty of confidentiality was "evidence only that such a lawsuit was filed and that certain allegations were made therein; it does not by itself establish that any confidential information was revealed by [plaintiff] or misused or disclosed [by attorney]"). Any inference that Kenney used information provided by Kendall in preparing the *Cain* lawsuit must, on this record, be based upon pure speculation and will not defeat summary judgment. *See Katy Venture, Ltd. v. Cremona Bistro Corp.*, 436 S.W.3d 415, 421 (Tex. App.—Dallas 2014, pet. filed); *Kyle Countrywide Home Loan, Inc.*, 232 S.W.3d 355, 359 (Tex. App.—Dallas 2007, pet. denied); *see also Hancock v. Variyam*, 400 S.W.3d 59, 70–71 (Tex. 2013) (equal inference rule).

Gillis produced no evidence that Kendall disclosed confidential information, and the summary judgment evidence conclusively established there was not such a disclosure. Accordingly, we conclude the trial court properly granted a summary judgment on appellants' claim that Kendall and Provost breached the fiduciary duty of confidentiality.

## *Damages*

In their no-evidence motion for summary judgment, Provost and Kendall asserted appellants have no evidence of damages and no evidence of an action by Provost or Kendall that would support an award of punitive damages. Having concluded the trial court did not err by

granting summary judgment in favor of Provost and Kendall on appellants' claims of breach of the fiduciary duties of loyalty and confidentiality, we need not address the merits of appellees' no-evidence motion for summary judgment on damages and punitive damages. *See* TEX. R. APP. P. 47.1.

## Conclusion

We conclude the trial court did not err in granting summary judgment in favor of Provost and Kendall. We resolve appellants' sole issue against them, and we affirm the trial court's judgment.

/Robert M. Fillmore/
ROBERT M. FILLMORE
JUSTICE

130892F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

DAVIS D. GILLIS, DAVE RICHARDSON, AND BARRY CLAUSS, Appellants

No. 05-13-00892-CV  V.

PROVOST & UMPHREY LAW FIRM, LLP AND JOE KENDALL, Appellees

On Appeal from the 160th Judicial District Court, Dallas County, Texas, Trial Court Cause No. DC-10-15198. Opinion delivered by Justice Fillmore, Justices Stoddart and Whitehill participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellees Provost & Umphrey Law Firm, LLP and Joe Kendall recover their costs of this appeal from appellants Davis D. Gillis, Dave Richardson, and Barry Clauss.

Judgment entered this 14th day of January, 2015.